**PIRG, et al, Plaintiffs,**

v.

**POWELL DUFFRYN TERMINALS, INC. (P.D. Oil & Chemical Storage, Inc.), Defendant.**

**Civ. A. No. 84–340.**

United States District Court, D. New Jersey.

Sept. 19, 1989.

---

Bruce J. Terris, Kathleen L. Millian, Carolyn Smith Pravlik, Terris, Edgecombe, Hecker & Wayne, Washington, D.C., Edward Lloyd, Newark, N.J., for plaintiffs.

Nathan M. Edelstein, Ridolfi, Friedman, Frank, Edelstein & Bernstein, P.C., Lawrenceville, N.J., for defendant.

POLITAN, District Judge.

The case before this Court presents another chapter in the never ending American environmental tragedy. A recalcitrant company in the private sector of the economy combined with the lethargic enforcement of the applicable statutes and regulations by the New Jersey Department of Environmental Protection and the Federal Environmental Protection Agency, has caused a continuing, if not constant, 11 year contribution to the pollution of the Kill Van Kull. It is indeed sad that none of

the participants cared sufficiently about the public trust—the environment—to take meaningful steps to avert the tragedy. This Court will not stand idly by to either, explicitly or tacitly, condone such inaction. For the reasons hereafter set forth, significant monetary penalties are necessary.

Before the Court is the question of the amount of civil penalties to be assessed against defendant, Powell Duffryn Terminals, Inc., for polluting the Kill Van Kull in violation of the Clean Water Act, 33 U.S.C. §§ 1251, *et seq* (the "Act"). Plaintiffs also seek a permanent injunction prohibiting defendant from violating its National Pollutant Discharge Elimination System/New Jersey Pollutant Discharge Elimination System ("NPDES/NJPDES"), Permit No. NJ 0003361.

By Orders dated January 13, 1986, March 13, 1987, and May 4, 1989, this Court determined that defendant had violated its Permit for a total of 386 times. Plaintiffs argue that the defendant should be fined the statutory maximum penalty which, in this case, is $4,205,000.00. The defendants counter that the assessment of civil penalties is discretionary with the Court and none are warranted in this case.

Section 505(a) of the Act, 33 U.S.C. 1365(a) authorizes this Court to assess "any appropriate civil penalties under Section 309(d) of this Act." Section 309(d), 33 U.S.C. 1319(d), prior to its amendment in 1987 provided:

Any person who violates §§ 301, 302, 306, 307, or 308 of this Act, [or] any permit condition or limitation implementing any of such sections in a permit issued under § 402 of this Act by the Administrator ... shall be subject to a civil penalty not to exceed $10,000.00 per day of such violation.

Consequently, each violation of the NPDES permit limitation, prior to the 1987 amendments, subjects the defendant to a statutory maximum penalty of $10,000.00 per violation. However, in 1987 Congress increased the statutory maximum to $25,000.00. Therefore, defendant's violations occurring on or after February 4, 1987 are subject to a penalty of up to $25,000.00.

Of the 386 violations, 363 of them occurred prior to February 4, 1987; 23 occurred after that date. Defendant is therefore liable for a maximum penalty of $4,205,000.00.

Section 309(d) of the Act requires the Court to consider specific factors in determining the appropriate civil penalty to be assessed for violations of the Act.

In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violations, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

§ 309(d), 33 U.S.C. § 1319(d).

The Court held a non-jury trial on the issue of what, if any, monetary penalty should be assessed against defendant and what, if any, injunctive or other equitable relief should be granted. Both parties have submitted extensive proposed Findings of Fact and Conclusions of Law. In the interests of clarity, I will first set forth my factual determinations and then proceed to the legal conclusions.

Plaintiffs Public Interest Research Group of New Jersey and Friends of the Earth, are non-profit corporations committed to environmental issues. Defendant P.D. Oil & Chemical Storage, Inc., operates a bulk chemical storage and transfer facility in Bayonne, New Jersey. Defendant's facility "receives bulk liquid commodities owned by others and holds them in storage tanks for loading, upon instruction from the commodity owners, to rail cars, tank trucks or ocean going tankers [via the Kill Van Kull]." *SPIRG v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1080 (D.N.J.1986). Between September 1977 and November 1988, defendant committed 386 violations of the effluent limitations in its 1974, 1981 and 1986 permits. These violations are summarized in the following table:

| Parameter | Number of Violations |
|---|---|
| Total Organic Carbon (TOC) | 8 |
| pH | 63 |
| Total Suspended Solids (TSS) | 66 |
| Bioassay | 1 |
| Oil and Grease | 48 |
| Hexavalent chromium | 2 |
| Petroleum Hydrocarbons | 27 |
| Methylene Chloride | 9 |
| Phenol | 1 |
| Biochemical Oxygen Demand (BOD) | 80 |
| Chemical Oxygen Demand (COD) | 81 |
| Total | 386 |

Of the 386 violations, 368 were violations of effluent limitations which had previously been violated. Two hundred sixty of those violations exceeded the applicable permit limitations by over 100%. One hundred ninety-five of them, exceeded the permit limitations by more than 200%. One hundred twenty-seven of them exceeded the applicable permit limitation by over 400%. Eighty-six of them exceeded the permit limitations by 1,000%.

Pursuant to the requirements of the Act, 33 U.S.C. § 1317(a), the EPA has published a list of toxic pollutants which includes phenol and methylene chloride. The EPA recently listed the 100 hazardous substances posing "the most significant potential threat to human health." 52 Fed.Reg. 12866 (April 17, 1987). The EPA's list is divided into four groups of 25 substances each in descending order of priority. Methylene chloride is priority group I and phenol is in priority group II. The defendant has violated the effluent limitations in its permit for methylene chloride 9 times. The defendant has violated its effluent limitation for phenol once, but its permit has only contained that limitation since August 1987. Defendant has committed 10 violations of toxic pollutant limitations in its permit.

BOD and COD effluent limitations are designed to limit the amount of oxygen demanding material which is discharged into receiving waters. "BOD is a measure of the oxygen requirement exerted by micro-organisms to stabilize organic matter. Waste water entering [a body of water] exerts an oxygen demand thereby depleting the amount of oxygen available for use by fish and plants. Without adequate oxygen, fish and plants die, eventually choking [the body of water]." *United States v. Metropolitan District Commission*, 23 ERC 1350, 1353 n. 4 (D.Mass.1985). Defendant's discharge of BOD and COD is particularly harmful because of oxygen deficiencies in the Kill Van Kull and the connected water-ways in the New York Harbor complex. New Jersey's Department of Environmental Protection, Division of Water Resources, has noted these deficiencies in the New Jersey 1980 State Water Quality Inventory, Report to the Congress through the Environmental Protection Agency, April 1980. That Report stated, at page 3, that "as in the past, the waters [of the Interstate Sanitary District] are plagued by ... low levels of dissolved oxygen." The 1982 State Water Quality Inventory reported that "although [the Interstate Sanitation District Waters] show a general overall improvement since the last ... inventory was compiled, District Waters are still plagued by low dissolved oxygen values during the summer months." The 1986 New Jersey Water Quality Inventory reported that "District Waters meet dissolved oxygen requirements during the winter; however, in some locations, dissolved oxygen values in the summer drop below standards for extended periods." Defendant's discharges added to the depletion of oxygen in the Kill Van Kull.

"TSS, or Total Suspended Solids, is an indication of the physical quality of the water. Very high levels of suspended solids can effect the ecology of [a body of water] by inhibiting light transmission needed for photosynthesis by which plants survive." *United States v. Metropolitan District Commission*, 23 ERC at 1353 n. 4. The EPA has stated, and this Court recognizes that suspended solids can have an adverse affect on fish growth and reproduction and reduce the supply of food available to the fish. *See EPA, Quality Criteria for Water*, pp. 404–408 (1976). Defendant has violated the TSS limits of its permit 66 times.

As this Court has already noted, defendant's BOD and TSS effluent limitations

are water based quality standards. *See SPIRG v. P.D. Oil*, 627 F.Supp. at 1088–1089. Water quality based effluent limitations are those which are designed to insure that water quality standards are met. Water quality standards, in turn, have been established to protect, restore, maintain and enhance a body of water so that it supports its designated uses and attains the fishable and swimmable goals of the Act. *See* 33 U.S.C. §§ 1311, 1312, and 1313; 40 C.F.R. 122.44(d). Any violations of these water quality based effluent limitations causes some degree of harm to the water quality of the Kill Van Kull.

Defendant has violated its permit with respect to oil and grease 48 times. New Jersey's 1980 State Water Quality Inventory stated at page 1 that "the waters [of the Interstate Sanitation District] are ... high in oil and grease...." That Report also stated at page 2 that "the quality of the District's waters is continuously degraded by ... large concentrations of both heavy metals and oil entering the waters from inadequately treated municipal and industrial wastes." The 1982 Water Quality Inventory stated that "District waters are still degraded by oil and grease...." Defendant's discharges of oil and grease have added to the problems relating to these pollutants in the Kill Van Kull.

The EPA has determined that "a pH range of 6.5 to 9.0 appears to provide adequate protection for the life of fresh water fish and bottom dwelling invertebrate fish food organisms. Outside of this range, fish suffer adverse psychological effects with an increase in severity as the degree of deviation increases until lethal levels are reached." *EPA, Quality Criteria for Water*, p. 341. Defendant has violated the pH limits of its permit 63 times.

Since the installation of a water treatment system known as "Zimpro" in May 1987, the frequency of defendant's violations has diminished substantially. However, the defendant has acknowledged violations of its permit since Zimpro's installation. Defendant offers no substantial evidence that it will not violate its permit in the future. Defendant's environmental consultant, LeRoy Sullivan, did not testify that defendant will not violate its permit in the future. Rather, he stated that defendant's waste water treatment plant is "adequate to meet the permit limits." Although the plant may be "adequate" to meet the permit limits if properly operated by defendant, Mr. Sullivan offered no testimony that the treatment plant, as actually operated by defendant, will meet the discharge limits contained in the permit in the future. Mr. Sullivan's testimony provides no basis for the Court to conclude that "the wrong will not be repeated". *Gwaltney of Smithfield Limited v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987).

Defendant's violations cause harm to the environment. This Court finds that based upon defendant's operations to this point, it is reasonable to conclude that its permit will be violated in the future.

Plaintiffs have attempted to convince the Court to penalize defendant for violating their permit from 1977 to 1987. Plaintiffs argue that whereas the technology to build a waste water treatment plant may not have been in existence in 1977, defendant had the option of hauling their waste water to an off-site treatment facility and thereby achieve compliance with their permit. The Court, however, is not convinced that facilities were available to treat defendant's waste water from 1977 until 1982. The Court finds that the defendant could have complied with its NPDES/NJPDES permit by hauling its waste water off-site from 1982 through April 1987, when it installed the Zimpro treatment plant and by hauling a portion of its waste water off-site from May 1987 through March 1988 in order to operate the facility in compliance with its permit. Defendant's environmental consultant, LeRoy Sullivan, testified that the DuPont Chamberworks facility in South Jersey was available to accept large qualities of waste water for treatment and disposal as early as 1982 or 1983. It has been stipulated by the parties by the DuPont facility did not accept waste water for off-site treatment prior to 1982. Mr. Sullivan estimated that the cost of defendant's waste water off-site for treatment and dis-

posal was approximately $.11 or .12 per gallon in 1985 dollars. Defendant has no records of the amount of its flow to the Kill Van Kull for any period from September 1977 through June 1985. Based upon Mr. Sullivan's estimate, the Court determines that defendant's discharge from September 1977 through March 1988 was approximately 66 million gallons. Therefore, it is clear that the defendant enjoyed a considerable economic advantage by not hauling its waste water off-site for treatment and neglecting its permit limitations.

Using the standards contained in the Act, 33 U.S.C. § 1319(d), the Court will now make findings as to each of the factors to be considered in assessing a penalty. As has already been noted by this Court, § 1319(d), as amended, provides that

in determining the amount of a civil penalty the Court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good faith efforts to comply with the application requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

### SERIOUSNESS OF DEFENDANT'S VIOLATIONS

The Court finds that defendant's 386 violations were very serious in nature. A significant number of the violations exceeded the permit limitations by large amounts. Significantly, some of the defendant's effluent was toxic to marine organisms because defendant's violations involved toxic pollutants and pollutants with the potential to cause environmental harm to the waters into which they were discharged. Moreover, the Court attaches significance to the large number of violations at issue.

### THE ECONOMIC BENEFIT RESULTING FROM THE VIOLATIONS

It is patently clear to this Court that defendant benefited a great deal from its lack of compliance with the permit. It is difficult to quantify the precise amount of benefit that the defendant incurred as a result of its noncompliance. Plaintiffs submit various methods by which this Court should compute the benefit. However, all of these methods result in amounts far in excess of the statutory maximum in this case. Therefore, those computations are of little help in guiding the Court as to what penalty should be imposed. Needless to say, those numbers compel this Court to gravitate towards the higher end of the penalty range, if not the maximum.

### DEFENDANT'S HISTORY OF VIOLATIONS

The Court finds that defendant's 386 violations spanned an 11 year period from 1977 to 1988. Defendant has violated its permit in each of those 11 years.

### DEFENDANT'S "GOOD FAITH" EFFORTS TO COMPLY WITH ITS PERMIT

It is perhaps under this section of the statute that the parties most differ. Plaintiffs attempt to portray the defendant as an egregious violator who, throughout the entire period at issue made no attempts whatsoever to comply with its permit and flagrantly violated both Orders of this Court and EPA decrees. On the other hand, the defendant asserts that it has made good faith efforts to comply all along and that it was lulled into complacency by both the New Jersey Department of Environmental Protection and United States Environmental Protection Agency.

This case is a tragedy in many respects. It demonstrates that private industry, left to its own initiative, will procrastinate indefinitely, even at the expense of the environment, any efforts to remedy an obviously poor situation. It further demonstrates that the government agencies empowered with protecting the environment are far from diligent in that regard. In July 1985 defendant's corporate secretary, Ronald Sprague, summarized defendant's attitude towards achieving compliance as follows:

We have consistently been unable to meet our permit limitations through any means and have been unwilling to com-

mit to treatment schemes. Improved housekeeping, vast amounts of concrete and asphalt to prevent ground water intrusion, capturing all available rain water to dilute our contaminated run-off—all these schemes have not improved our water quality.

As a result of years of non-compliance, and even though environmental enforcement agencies have appeared complacent, we now face a much different climate. We are being sued by PRIG, an environmental bounty hunting group. This action has forced DEP to change its complacing [sic] and impose a consent order upon PD, the bottom line of which is that by May 31, 1986, PD must have *completed* pilot work and design work to the point of submitting an application for Treatment Works approval. This application must show that our proposed Treatment Works will enable our out-fall to *fully* comply, on a routine basis, with *all* limitations of our permit. [Emphasis in original].

Defendant, at times with the tacit approval of the EPA, was content to go on polluting the Kill Van Kull indefinitely. The pace at which the EPA was requiring defendant to proceed with the treatment facility was minimal at best. It was not until PIRG came on to the scene that the EPA started meaningfully enforcing its permits and required defendant to actually build some sort of waste water facility.

Looking at this from a realistic perspective, it is hard to penalize defendant the maximum penalty for its lack of good faith in this regard. Companies generally operate with economic benefits as a goal. Clearly it was less expensive to procrastinate and build temporary stop-gap measures to try and comply with the permit than to build a waste water facility sooner than was absolutely necessary. This Court does not condone defendant's behavior. Companies must be mindful of the environment and take measures to bring themselves into full compliance with all out-standing permits. However, fault also lies with the EPA and with the New Jersey DEP. Throughout defendant's term of non-compliance, these environmental agencies were aware of defendant's activities and took no affirmative measures other than an occasional threatening letter to bring defendant into compliance. A brief recitation of defendant's history is in order.

Defendant's parent corporation, Powell Duffryn, USA, Ltd., purchased all of the issued and outstanding stock of the El Dorado Terminals Corporation on July 22, 1977. At that stock purchase Powell Duffryn, USA, Ltd. was informed that it was purchasing the stock of a corporation which was subject to an enforcement action by the United States government for its failure to comply with the terms and conditions of its NPDES permit. The sale agreement specifically provided that:

> Except as specified in Exhibit F hereto, there are no claims, actions, suits, or proceedings pending or, to the knowledge of Sellers, threatened against or affecting the Sellers, the company ... or any of their respective properties and assets, at law or in equity, or before any arbitrator, or before or by any governmental department, agency or other instrumentality of any kind, domestic or foreign, which may result in any materially adverse change in the business, operations, properties or assets of the Company or in the condition, financial or otherwise, of the Company....

Exhibit F lists the enforcement action by the United States against the defendant as follows:

> Current status of *United States of America v. El Dorado Terminals Corporation*, Civil Action No. 77–228 in the United States District Court for the District of New Jersey, including, without limitation, status of Order On Consent of Environmental Protection Agency *In the Matter of El Dorado Terminals Corporation*, NPDES Permit No. New Jersey 0003361.[1]

---

1. Civil Action 77–228 was resolved by the entry of a Consent Judgment as an Order of this Court on April 14, 1977. In the Consent Judgment, defendant admitted that it had violated its NPDES permit and that it had "failed to construct an appropriate treatment facility for its

Throughout the next several years, defendant received mixed reviews from the EPA and the NJDEP. At times defendant was informed that it was acting in "good faith" by attempting to contain its discharges to within the permit perimeters. *See* Letters of August 16, 1977 and October 25, 1977 from Steven Rubin, Environmental Engineer, Water Facilities Branch of the EPA, to the defendant (permittee (defendant) has demonstrated a good faith attempt to comply with the permit); NPDES Compliance Inspection Report dated March 15, 1983 from Larry Parker, of the EPA ("I conducted an inspection of the above subject facility on March 11, 1983. The inspection revealed that the permittee has complied in good faith regarding contaminated storm run-off discharge, by constructing dikes and paving areas to confine possible contaminated run-off.").

At other times, the EPA wrote to defendant stating that defendant's discharging monitoring reports ("DMR") indicate that the discharge may not comply with certain effluent limitations contained in the permits. *See, e.g.,* Letters dated November 7, 1980 and September 1, 1981 from the Water Enforcement Branch of the EPA to the defendant. Additionally, on November 2, 1981 the Water Enforcement Branch of the EPA wrote to the defendant stating:

> Your DMR for the reporting period ending August 31, 1981 indicates that the discharge again does not comply with certain of the limitations specified in your permit.... A review of past DMRs reveals a serious and persistent pattern of violations. It is necessary that the corrective measures you are taking be sufficient to ensure future compliance.

These inconsistent reports continued until roughly 1984 when plaintiffs filed suit in this Court alleging that "the defendant has violated and continues to violate §§ 301 and 402 of the Federal Water Pollution Control Act by failing to comply with the effluent limitations in its ... permit." On April 5, 1984 a joint EPA and NJDEP inspection of defendant's facility was conducted which concluded that the defendant was still in violation of its effluent permit. In September 1984 the NJDEP issued an Administrative Consent Order which alleged that defendant "has violated the conditions of [its permit] ... in that it has ... failed to comply with the final effluent limitations required by ... said permit." The Administrative Consent Order required defendant to submit a plan and schedule for "design and operation" of a waste water treatment facility and to comply with all terms and conditions of [its permit]." In late 1985, only after substantial pressure was brought to bear on the defendant as a result of plaintiffs' actions, defendant submitted to NJDEP a Treatment Works Approval Report seeking approval to move forward with the Zimpro water treatment facility. A Treatment Works Approval Permit is required under New Jersey law pursuant to N.J.S.A. 58:10A–1, *et seq.,* and N.J.A.C. 7:14A–12.1, *et seq.,* before construction and/or operation of a waste water treatment facility can begin. Throughout 1986, although still not in compliance with its permit, defendant made headway in constructing the Zimpro plant. The Zimpro system was installed and began operations on May 1, 1987. Since the installation of Zimpro the amount of defendant's violations has been reduced significantly.

In conclusion, this Court cannot say that defendant's actions rose to the level of "good faith". It is clear to this Court that defendant, motivated possibly by greed or apathy, chose to procrastinate. What makes this particularly distressing is that defendant's actions were done, for the most part, with the EPA's approval. That fact alone weighs in favor of not imposing on the defendant the maximum statutory penalty.

### ECONOMIC IMPACT OF THE PENALTY ON THE VIOLATOR

While it is not binding on the Court, the EPA's 1986 penalty policy provides that the

---

pollutant discharge in violation of the said NPDES permit ...". That Consent Judgment ordered defendant to pay a civil penalty of $10,-

000.00 for the violations of the Clean Water Act alleged in the Complaint.

defendant has the principle burden of establishing that the penalty should be reduced because of the economic impact. Defendant has failed to demonstrate that assessing a severe penalty would jeopardize defendant's continued operation. *See Chesapeake Bay Foundation v. Gwaltney,* 611 F.Supp. 1542, 1562 (E.D.Va.1985) (the Court was "unpersuaded that any penalty warranted by *Gwaltney's* violations would jeopardize *Gwaltney's* continued operation"), *aff'd,* 791 F.2d 304 (4th Cir.1986), *vacated and remanded on other grounds,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

Defendant claims that it is in a relatively poor economic position. The Court is not persuaded that this is the case. Defendant is a wholly owned subsidiary of Powell Duffryn, U.S.A., Ltd., a holding corporation organized under the laws of the State of Delaware. Powell Duffryn, U.S.A., Ltd. is owned by Powell Duffryn International. Powell Duffryn International is owned by Powell Duffryn p.l.c., a British corporation which is publicly traded on the London Stock Exchange. During the past 11 years, defendant has expanded the size of its facility to more than double its original size by building a westside expansion and an eastside expansion which is a joint venture with the Dow Chemical Company. In 1985, defendant started an anti-freeze packaging division at its Bayonne, New Jersey facility and at its Lemont, Illinois facility. Defendant also operates two wholly-owned subsidiaries providing bulk terminal storage facilities in Savannah, Georgia and Lemont, Illinois.

### CONCLUSIONS OF LAW

In applying the statutory penalty factors set forth in the act, the Court has considered the civil penalty policy developed by EPA. This Court has recently noted that "although the EPA penalty policy does not have the force of law, it is consistent with the Congressional policy behind the Act". *SPIRG v. Hercules, Inc.,* 29 ERC 1417, 1418 (D.N.J.1989). The Court also noted that "the 1987 amendments, while not incorporating the language and detail expressed in the EPA penalty policy, serve as a reasonable summary of that policy." *Id.*

Civil penalties seek to deter pollution by discouraging future violations. *SPIRG v. Hercules,* 29 ERC at 1423; *SPIRG v. A.T. & T. Bell Laboratories, Inc.,* 617 F.Supp. 1190, 1201 (D.N.J.1985). To serve this function, the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business. Otherwise, a rational profit maximizing company will choose to pay the penalty rather than incur compliance costs. *See EPA, Policy on Civil Penalties* (February 16, 1984) at p. 3. Additionally, the probability that a penalty will be imposed must be high enough so that polluters will not choose to accept the risk that non-compliance with go unpunished. *Id.*

The Court is satisfied that the defendant enjoyed significant economic benefit from its failure to bring itself into compliance with its permit sooner than 1988. Based upon this Court's factual findings, that economic benefit is in excess of the statutory maximum penalty of $4,205,-000.00. Regrettably, were this Court to assess the statutory maximum, defendant would still have benefited from its non-compliance. Defendant's violations are serious in nature. The seriousness of these violations would also lead this Court to impose the statutory maximum on the defendant. Moreover, the defendant has not demonstrated to the satisfaction of this Court that a severe economic penalty would jeopardize its continued operation. Therefore, defendant's economic status has no bearing on the imposition of penalties. Defendant has also had a long history of violations which would also lead this Court to impose the statutory maximum.

With regard to defendant's "good faith" attempts to comply with the Act, the Court will adjust the statutory maximum downwards by $1,000,000.00 because of the actions and/or non-actions taken on behalf of the United States Environmental Protection Agency and the New Jersey Department of Environmental Protection. The

Court finds that had they acted more diligently in making defendant comply, the violations in this case would have ceased long ago. Therefore, those two governmental bodies are partially to blame for the defendant's lack of compliance for the years at issue.

■ The Court explicitly rejects defendant's contention that no penalty should be assessed against it because there has been no adverse impact on the Kill Van Kull as a result of the permit violations. Congress has stated that the objective of the Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. 33 U.S.C. § 1251(a). The EPA has recognized that "all pollutants introduced into the environment create some harm or risk, of course, and it will be difficult in many cases to precisely quantify the harm or risk caused by the violation in question." EPA, *Civil Penalty Policy* (July 18, 1980) p. 10. In *SPIRG v. Hercules*, defendant argued for a low penalty based on the lack of measurable harm from its violations. In responding to that argument the Court stated

> The Congressional declaration of goals and policy set forth in 33 U.S.C. § 1251 seeks the restoration and maintenance of the chemical, physical and biological integrity of the nation's water. *Hercules'* violations have produced at least a potentially destructive impact on the waterways in its area. Therefore, the Court does not agree with *Hercules* that a relatively low penalty factor should be assigned to this aspect of its violations.

Similarly, in *PIRG v. C.P. Chemicals*, 26 ERC. 2017, 2021 (D.N.J.1987), the Court concluded "if the Court were to adopt defendant's view, ... any permittee could ignore the requirements of its permit with impunity so long as it discharged into already heavily polluted waters. Clearly, any argument that toxic discharges fail to make the receiving waters measurably worse frustrates the Act's intent to improve the quality of our nation's waters." The parties have stipulated, and the Court recognizes that the Kill Van Kull is one of the most industrialized water-ways in the

Eastern United States. Therefore, even if defendant's discharge did not measurably damage the Kill Van Kull, the fact that defendant violated its permit by discharging more pollutants than authorized means that the restoration and enhancement of the river's water quality was inhibited and therefore, the objective of the Act was frustrated.

■ The Court must determine whether or not a permanent injunction prohibiting defendant from violating its permit should issue. In *SPIRG v. Monsanto Company*, Judge Van Artsdalen was faced with a similar situation. Plaintiff sought injunctive relief enjoining defendant from violating its permit. Defendant contended that injunctive relief was not warranted because there were no violations since May of 1986. *SPIRG v. Monsanto Company*, 83–2040, Slip Op. at 35, 1988 WL 156691 (D.N.J. March 24, 1988). The Court enjoined defendant until April 30, 1990, roughly one year from the date of the Order from violating its permit. The Court reasoned that:

> [S]o long as Monsanto continues in full compliance with the permit, the added compulsion of an injunction will cause no harm to Monsanto. Conversely, if there are any future violations and no injunction is presently issued, before any sanction, penalty or abatement could be ordered, another EPA order enforcement action or citizen suit enforcement action would have to be instituted with its consequent expense and delay.

*Id.* at 36. The Court continued that

> especially in light of my serious doubt that in a citizen suit any penalty can be imposed for pre-complaint violations, plus the *Gwaltney* requirement of good faith allegations of on-going violations ... a later legal action, should there be violations, would appear at best to provide inefficient and inadequate remedies, when compared to entering an injunction in this case."

*Id.* at 36–37. This Court fully adopts the rational of the *Monsanto* court in enjoining defendants.

By Order dated October 28, 1988, this Court denied plaintiff's request for a pre-

**1168**

liminary injunction. In doing so, I noted that plaintiff had failed to demonstrate the imminence of irreparable harm absent the issuance of an injunction. *PIRG v. P.D. Oil*, No. 84–340, Slip Op. at 14 (D.N.J. October 28, 1988). The Court relied in part on the fact that defendant had submitted DMRs which demonstrated that it was in compliance with its permit from May through July 1988. Since that time, the defendant has violated its permit at least once. Therefore, the Court can no longer be satisfied that the defendant will comply with its permit absent the issuance of an injunction. It is well established that the grant or denial of a request for a preliminary injunction is not binding on the issue of a permanent injunction following a trial. *See E.P.G., University of Texas v. Camenisch*, 451 U.S. 390, 394, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981).

In response to the application for an injunction, the defendant argues that since the installation of Zimpro any violations of the permit have been "one time mistakes" and were caused without fault on its part. This argument must fail. As the Court noted in *SPIRG v. Monsanto*,

An NPDES permit requires full compliance. It imposes liability without fault. Fault may be a proper consideration in determining what, if any, penalty to impose but lack of fault does not exempt the discharger from complying with its permit.

*Id.* at 35.

The standards for issuance of a permanent injunction are:

(1) Actual success on the merits;

(2) Irreparable harm to the moving party;

(3) Harm to other interested persons, including the non-moving party; and

(4) The public interest.

*Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987).

Plaintiffs have clearly met this standard. They have demonstrated actual success on the merits; they have demonstrated irreparable harm to themselves and the public by having defendant discharge pollutants into the waters of the Kill Van Kull, absent the issuance of an injunction. The third factor, harm to other interested persons, including the non-moving party, clearly weighs in favor of granting the permanent injunction. If defendant is in compliance of its permit, it will suffer no injury. There is no additional burden placed on defendant. Lastly, the public interest clearly mandates in favor of a permanent injunction. Defendant was given the opportunity during the course of these proceedings to comply with its permit absent the issuance of a preliminary injunction. Defendant has failed to do so. Therefore, this Court will enjoin defendant from violating the terms and conditions set forth in its NPDES permit.

■ Lastly, the question remains as to how the Court should disperse the penalty. Merely having these monies paid to the Federal Treasury does not, in this Court's judgment, satisfy the purposes of the Act, nor completely discharge this Court's duty in environmental cases. This Court has an affirmative obligation to direct those funds to ameliorate environmental pollution. Paid into the public coffers, the penalties lose their identity and indeed, in all likelihood, will be used for other purposes. By retaining jurisdiction over the disbursement of these penalties, this Court can be assured that the actions taken by plaintiff (a public action group) to protect the environment will be vindicated and the fruits of its labor properly reinvested in the environment. Consistent with the remedial purpose of the Act and the above outlined goals, the Court will appoint three Trustees for the fund to investigate and recommend to this Court how these funds should be used to directly impact environmental problems in New Jersey.

The foregoing constitutes my findings of fact and conclusions of law.

An appropriate Order accompanies this Opinion.

### ORDER

For the reasons outlined in this Court's Opinion, dated September 19, 1989,

IT IS on this 19th day of September, 1989,

ORDERED that:

1. The defendant, Powell Duffryn Terminals, Inc. (P.D. Oil & Chemical Storage, Inc.), shall pay as a civil penalty for violations of its National Pollutant Discharge Elimination System (NPDES) Permit the sum of $3,205,000.00.

2. The defendant, Powell Duffryn Terminals, Inc. (P.D. Oil & Chemical Storage, Inc.), is hereby restrained and enjoined from making or causing any discharges into the Kill Van Kull from its waste water treatment plant in Bayonne, New Jersey that exceed any limitation and/or fail in any way to comply with the terms and conditions of the National Pollutant Discharge Elimination System (NPDES) Permit issued to and effecting Powell Duffryn, including its present permit, NJ 003361, any and all additions and/or amendments and any and all permits that may hereafter be issued by any agency, state or federal, that is issued pursuant to the Clean Water Act, 33 U.S.C. § 1251, *et seq.*

3. MORRIS PASHMAN, DONALD A. ROBINSON, and JOEL A. PISANO, are hereby appointed Trustees to receive the penalties assessed against the defendant pursuant to this Order and accompanying Opinion, to investigate ways in which said monies may be disbursed to implement the intent of the Opinion and Order and to disburse said funds pursuant to further order of this Court.

4. Pursuant to 33 U.S.C. § 1365(d) which provides that the Court "may award costs of litigation (including reasonable attorneys' and expert witness fees) to any party, when the Court determines such an award is appropriate", plaintiff is directed, within thirty (30) days of this Opinion and Order, to submit to the Court affidavits detailing services rendered and costs incurred in connection with this suit. Defendant will be given an additional twenty (20) days to respond to plaintiffs' affidavits. After receipt of the parties' submissions, the Court will render an appropriate award with regard to fees.