NATURAL RESOURCES DEFENSE
COUNCIL, INC.

and

Delaware Audubon Society, Plaintiffs,

v.

TEXACO REFINING AND
MARKETING, INC.,
Defendant.

Civ. A. No. 88–263–JRR.

United States District Court,
D. Delaware.

Aug. 13, 1992.

4

C. Scott Reese of Cooch & Taylor, Wilmington, Del. Mitchell S. Bernard and Joseph H. Guth, of Natural Resources Defense Council, Inc., New York City (of counsel), for plaintiffs.

Richard D. Allen and Palmer L. Whisenant of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

ROTH, Circuit Judge.[*]

Plaintiffs, Natural Resources Defense Council ("NRDC") and Delaware Audubon Society, brought a citizen suit under the Federal Water Pollution Control Act (the "Clean Water Act" or the "Act"), 33 U.S.C. § 1251 *et seq.*, against Texaco Refining and Marketing Inc. ("Texaco"), for alleged violations of a state-issued permit limiting effluent discharge from Defendant's Delaware City oil refinery. In the present opinion, we will consider standing and jurisdiction questions, raised by the defendant. We also, on the basis of the evidence presented at trial, will make findings of fact and conclusions of law on the penalties

applicable to defendant for violation of the Clean Water Act and on the question of whether a permanent injunction should issue.

At an earlier stage of this proceeding, we considered the parties' cross-motions for summary judgment: we denied defendant's motions and granted plaintiffs'. *Natural Resources Defense Council v. Texaco Refining,* 719 F.Supp. 281 (D.Del.1989) (*"Texaco I"*). Defendant's motions had been based on several contentions: that we lacked jurisdiction to hear most of plaintiffs' claims because they related wholly to past violations of the Act; that the NRDC representatives who submitted affidavits with the complaint were not NRDC members when many of defendant's permit violations occurred; and that the reissuing of the permit in 1989 rendered plaintiffs' claims moot. Plaintiffs' motion for summary judgment was based on the determinative nature of defendant's Discharge Monitoring Reports ("DMR's"). We found that Texaco was liable for violation of the permit based on the "practically unassailable evidence" of the DMR's. *Id.* at 289. Because we determined that plaintiffs had shown probable cause that the Act was being violated, we also at that time enjoined defendant from future violations of the 1989 permit. Defendant appealed the granting of the injunction to the Third Circuit Court of Appeals. Finding that we had applied the wrong standard and that it was instead the traditional equitable standard, including irreparable injury, inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest, which had to be met, the Court of Appeals vacated that portion of our order enjoining Texaco from violating its new permit and remanded the issuing of the injunction to us for reconsideration. *Natural Resources Defense Council v. Texaco,* 906 F.2d 934 (3d Cir.1990) (*"Texaco II"*).

A three week bench trial was held in February 1991 and a further hearing on the issue of standing was held in June 1991. On the basis of the evidence present-

---

[*] Before post-trial briefing was completed, Judge Roth assumed her duties as a member of the

United States Court of Appeals for the Third Circuit.

ed, we conclude that the plaintiffs have standing to bring this action; that we have jurisdiction over 365 of the violations alleged by plaintiffs, but that we lack jurisdiction to hear the other 49; that as a result of the violations Texaco must pay a penalty of $1,680,000; and that Texaco will be permanently enjoined from further violation of the 1989 permit and directed to comply with the permit's investigatory, reporting, and monitoring provisions.

## FINDINGS OF FACT

On May 17, 1988, the day that the complaint was filed in this action, Texaco owned and operated an oil refinery on the banks of the Delaware River. The refinery was originally built by Tidewater Oil Company. Texaco has owned and operated the refinery since late 1984.[1] The refinery has the capacity to process approximately 150,-000 barrels of crude oil per day. It draws an annual average of about 310 million gallons of water per day from the Delaware River for use in the refining process. About 300 million gallons are used as once-through noncontact cooling water to cool equipment at the refinery and an associated power station. This noncontact cooling water does not come into contact with the crude oil, intermediate process streams or refined petroleum products, or any waste produced at the refinery. It is routed through the equipment in totally enclosed tubular heat exchangers.

Other water is used in various stages of the actual refining process. This "process" water comes into contact with raw materials, intermediate process streams or the products produced by the refinery. It absorbs some contaminants. The process wastewater is routed to the refinery's wastewater treatment plant for treatment before discharge into the river. The plant also receives for treatment sanitary wastewater from the refinery offices and other buildings, as well as rain water and rain water runoff.

The original treatment plant for the refinery was installed when the refinery was constructed in the mid–1950's. A biological treatment system was installed in 1974. A second stage biological treatment facility and final filtration was added to the existing treatment plant and began operation in the fall of 1980.

The principal stages of treatment through which the flow to the treatment plant passes are the following: oil/water separators, equalization tanks, flash mixing, flocculation, dissolved air flotation, aeration, clarification, additional aeration, additional clarification, and filtration, after which the stream is discharged into Guard Basin No. 4. The system includes two stages of biological treatment, in which there is a biomass of bacteria which actually eats the pollutants contained in the water. The bacteria population needs air and a constant supply of food and can be affected by many factors such as pH and temperature.

The refinery also has, upstream of the wastewater treatment plant, a sourwater stripping unit, which removes both ammonia and sulfides. The current sourwater stripper system began operation in 1980.

Pursuant to the Federal Water Pollution Control Act, the Delaware Department of Natural Resources and Environmental Control ("DNREC") issued a National Pollutant Discharge Elimination System ("NPDES") permit to Texaco, effective July 1, 1977 (the "1977 permit"). This permit, numbered DE0000256, authorized the refinery to discharge into the Delaware River limited quantities of various pollutants. It established seven "outfalls" at the refinery, designated 001, 002, 101, 201, 301, 401, and 501, where pollutants are discharged.

The permit also specified what are known as "parameters" at each outfall. A "parameter" in the permit is a particular attribute of the refinery's discharges. Permit parameters included specific pollutants, such as ammonia, as well as other charac-

---

1. Since January 1, 1989, the refinery has been owned and operated by Star Enterprise ("Star"), a partnership between Texaco and a subsidiary of the Saudi Arabian Oil Company. Each partner appoints half of Star's management committee.

teristics of the stream measured, such as temperature or flow rate. The permit specifically subjected most parameters to precise effluent limits. To assure that these limits were met, the permit required Texaco to sample each parameter at each outfall at specified intervals, using specified testing methods, and to report the results of those tests in Discharge Monitoring Reports which were submitted to DNREC monthly.

Of concern here are twelve separate parameters, each of which measures a distinct aspect of refinery operation. A brief summary of these parameters follows.[2]

—*Oil and grease* can coat sediment or organisms and have either acute toxic or chronic sublethal effects. Compounds in the oil and grease group also accumulate in organisms, creating concentrations in tissues many times the concentration in the ambient water. The compounds of oil and grease attach to particles suspended in the water and fall into sediments. They can remain there for months, years, or decades.

—*Ammonia* (NH3) and *phenols* can also be toxic. They can react with chlorine, which is found in the Texaco effluent, to form deadly compounds.

—The nontoxic pollutants, namely *total suspended solids* (TSS), *biological oxygen demand* (BOD) and *total organic carbon* (TOC) can nevertheless have an adverse effect on the receiving system. BOD is a measure of the rate at which oxygen is removed from water by pollutants and microorganisms. The sensitive oxygen balance in an aquatic ecosystem can be thrown off by a high concentration of organic material. TSS measures both organic and inorganic materials. Solids in suspension burden aquatic life by depleting the oxygen content of water and clogging the respiratory passages of various fauna. Suspended solids can also carry other pollutants. TOC consists of the sum of dissolved and particulate carbon present in the water. While TOC occurs in nature, a high TOC level will provide the substrate

for a high BOD due to microbial breakdown of organic matter. Particulate carbon can carry pollutants. The three are often interrelated.

—*"pH"* is a quantitative measure of the acidity of liquid solutions. It ranges on a scale from 1 to 14. A pH of more than 7 is basic, while one of less than 7 is acidic. High or low pH can have severe effects on aquatic organisms.

—*Temperature* changes can have adverse effects on life forms in a receiving stream.

—High *iron* levels, like *sulfide* levels, are crucial because they can have a toxic effect on an aquatic ecosystem.

—*Bioassay* tests measure the survival rate of organisms present in effluent from the Refinery.

—*Flow* measures the discharge of water from a given point at the Refinery in gallons or meters per day.

The 1977 permit expressly provided that the "discharge of any pollutant identified in this permit ... at a level in excess of that authorized shall constitute a violation of the permit." Plaintiffs' Exhibit ("PEX") 1, p. 18, ¶ A.1. In the event of a violation of any daily maximum effluent limit, the 1977 permit required Texaco to "provide the State with ... [a] description of the discharge and cause of noncompliance; and [t]he period of noncompliance, including exact dates and times; or, if not corrected, the anticipated time the noncompliance is expected to continue, and steps being taken to reduce, eliminate and prevent recurrence of the noncomplying discharge." PEX 1, p. 18, ¶ A.2.

The 1977 permit further directed Texaco to "take all reasonable steps to minimize any adverse impact to waters of the State resulting from this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge." PEX 1, p. 18, ¶ A.4. The 1977 permit, as modified in

2. The following description of the characteristics and properties of these parameters is largely drawn from the testimony of Dr. Robert Livingston, an expert witness who appeared on behalf of plaintiffs.

March 1981, was in effect through January 1989.

In December 1981, Texaco applied for a new permit, but continued thereafter to operate under the 1977 permit pending decision by DNREC on the terms of the new permit. On January 31, 1989, DNREC issued a new permit ("the 1989 permit") to an entity known as Star Enterprise. Star, a joint venture created in part by Texaco, had then become the operator of the Refinery. The 1989 permit effected a number of changes from the 1977 permit, including the addition of a new outfall, the elimination of outfall 501, the addition of new parameters, the modification of numerous effluent limits, and various other changes. The 1989 permit also expressly provided for an upset defense.[3] On the other hand, the new permit still flatly prohibited the discharge of any identified pollutant at a level in excess of the authorized effluent limit. PEX 2, p. 23, ¶ A.1. The reporting and monitoring provisions in the 1989 permit remained similar to those contained in the 1977 permit. PEX 2, p. 23, ¶ A.2; p. 24, ¶ 4.

In a summary judgment order dated September 20, 1989, we found that Texaco had violated the effluent limits of the 1977 permit 369 times between March 1983 and January 1989. *See Texaco I.* At trial, plaintiffs alleged 385 such violations from March 1983 through January 1989. PEX 68. The additional violations were reported on Texaco's DMR's and were not rebutted by the defendant. In addition, during trial plaintiffs discovered 12 violations of the 1977 permit that had never been reported by Texaco. Texaco admitted these violations.[4]

Plaintiffs presented evidence derived from Texaco's DMR's of 15 violations of the 1989 permit from June 1989 through May 1990. PEX 68, violations 363–377; PEX 61–67. Texaco did not contest this evidence. After trial concluded, but before the record was reopened for testimony on the issue of standing, plaintiffs discovered evidence of two further violations. PEX

68, violations 378–79. This evidence was received by the Court.

The plaintiffs thus alleged that Texaco committed a total of 414 violations of the effluent limitations embodied in the refinery's NPDES permits from March 1983 through February 1991. Plaintiffs alleged further that in connection with some of these violations Texaco breached the reporting and monitoring obligations imposed by the 1977 and 1989 permits. As we explain below, there is merit to most, but not all, of these allegations.

Plaintiffs seek civil penalties and injunctive relief as a result of Texaco's permit violations. With regard to the latter, plaintiffs specifically seek an injunction (i) barring further permit violations by the refinery, (ii) requiring the refinery promptly and thoroughly to investigate and report to DNREC the cause of any future permit violation, and (iii) directing the refinery to sponsor a monitoring program adequate to assess the nature and impact on the receiving waters of its prior and any future noncomplying discharges. However, before we can determine what relief may be obtained, we must first consider issues, raised by defendant, of standing and jurisdiction.

## I. STANDING

As it did earlier in this litigation, Texaco contends that the plaintiffs lack standing. *See Texaco I* at 287–88. We find this contention to be without merit.

To establish representational standing, the plaintiffs, NRDC and the Delaware Audubon Society, must show that (a) their members would have standing, (b) the interests the organizations seek to protect are germane to their purposes, and (c) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

---

3. For a definition of "upset defense" see p. 34.

4. These violations are included in amended PEX 68, Docket Item ("D.I.") 143.

Texaco does not dispute that the plaintiffs have satisfied the second and third elements of this test. We agree that they have. The interests in clean water that the plaintiffs seek to protect are germane to the purposes of the two organizations. *See* PEX 460 (NRDC Certificate of Incorporation) at 2; Tr. A–62 (Pierce–Beck) (describing purposes of Delaware Audubon Society). This litigation is particularly suited to the accomplishment of the plaintiffs' organizational goals and expertise, *see generally Associated Gen. Contractors of Connecticut, Inc. v. New Haven*, 130 F.R.D. 4, 8–9 (D.Conn.1990), and the claims are asserted on a group rather than an individual basis. Finally, the requested penalties and injunctive relief would benefit all of plaintiffs' members and would not require participation of individuals. *See Sierra Club v. Aluminum Co. of America*, 585 F.Supp. 842, 853 (N.D.N.Y.1984). Thus, all that remains for us to consider is whether plaintiffs' members themselves would have standing to sue Texaco for its NPDES permit violations. For the reasons that follow, we find that they would have such standing.

◼◼◼ The appropriate standing analysis derives from the Clean Water Act and the United States Constitution. Any "citizen" may commence a civil enforcement action under the Clean Water Act. 33 U.S.C. § 1365(a). The Act defines "citizen" as a "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). These provisions confer standing to the limits permitted by the Constitution. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 70 n. 3 (3d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 444 (D.Md. 1985). Under the Constitution, a party has standing to sue when it possesses "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends...." *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663

(1962). The plaintiff in a citizen suit has a "sufficient stake" in a controversy where that plaintiff "personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," the injury "fairly can be traced to the challenged action," and the injury "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Powell Duffryn*, 913 F.2d at 70. We now analyze these three factors.

### A. *Injury in Fact*

◼◼◼ We find that the plaintiffs have established the requisite injury in fact. Injury to aesthetic or recreational interests is sufficient to confer standing. *See Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). *See also, Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16–17, 101 S.Ct. 2615, 2624–25, 69 L.Ed.2d 435 (1981); *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.*, 692 F.Supp. 801, 807 (N.D.Ill.1988). These interests need not be large; an "identifiable trifle" will suffice. *Powell Duffryn*, 913 F.2d at 71 (quoting *United States v. Students Challenging Regulatory Agency Procedures (S.C.R.A.P.)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)).

In the present case, the plaintiffs' member-witnesses testified to injuries far more severe than an "identifiable trifle." All four testified that the pollution they observed in the Delaware River near the Texaco plant interfered with their enjoyment of a variety of activities, including bird-watching, recreation in waterfront parks, and walking and driving along the River. *See* Tr. A–5–13 (Ednie); A–26–31 (Nickle); A–62–65 (Pierce–Beck); A–87–89 (Hotchkiss). These members also testified that because of the pollution they refrained from engaging in a number of activities they once enjoyed, including water skiing, swimming, boating, fishing, and consumption of local fish. *See* Tr. A–13–16 (Ednie);

A–31–35 (Nickle); A–65–67 (Pierce–Beck); A–85–87, 90 (Hotchkiss). We find that this testimony describes injuries that satisfy the requirements of Article III.

██ Texaco mounts three attacks on the testimony of these member-witnesses. First, it argues that their concerns relating to swimming and eating fish do not establish injury because the section of the River near the Texaco Refinery is allegedly swimmable and fishable. While it is true that the Delaware River Basin Commission has recommended upgrading the status of the area that encompasses the Refinery, the most recent report from that institution states that use of the area is still greatly threatened by industrial pollution. *See* PEX 373 at 21. Since the member-witnesses were deterred in the past from using the area because of such industrial discharges, are presently reluctant to use it, and face future deterioration of conditions there, the possibility that the area may now meet an administrative definition of swimmability and fishability does not detract from the palpability of the injuries, and threats of injury, felt by these member-witnesses.

Texaco's second concern is that member-witnesses Horace Hotchkiss and John Nickle either have not changed their fish eating habits or were slow to change them. This argument is misdirected, for Hotchkiss does not knowingly eat fish caught in the River and Nickle's worries about the quality of River fish evolved over time. As the plaintiffs note, to establish standing these member-witnesses need not cut off all possibility of consumption of River fish. Rather, all that is required is that they show they have suffered some actual or threatened injury to their preferred eating habits.

Finally, Texaco generally objects to the testimony of Nickle on the ground that he is not a member of the Delaware Audubon Society. Nickle's father took out a family membership in 1981, and Nickle himself testified that he has since then considered himself a member of the Society even though he did not reside with his father. Texaco argues that since the Society has not affirmatively "resolved" Nickle's precise membership status, "the logical inference" is that he is not a member. This argument is unavailing because there was ample testimony to establish his membership. For example, Grace Pierce–Beck, a former President of the Society, stated she thought Nickle was a full member by virtue of his father's family membership. Moreover, Nickle's participation in Society events bespeaks a full role in the organization, one far greater than the passive role that Texaco would ascribe to him.

In sum, we find that the plaintiffs' members have suffered the injury in fact necessary to confer standing on NRDC and Delaware Audubon Society.

### B. *Traceability*

██ The plaintiffs can establish the element of traceability by showing that there is a "substantial likelihood" that Texaco's conduct caused the plaintiffs' harm. The plaintiffs here are able to make such a showing by demonstrating that Texaco has "1) discharged some pollutant in concentrations greater than allowed by its [NPDES] permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *Powell Duffryn*, 913 F.2d at 72. Texaco challenges only the plaintiffs' proof of the third element, claiming that the plaintiffs failed to show a sufficient link between their injuries and the Refinery's permit violations. We find this contention to be without merit.

Texaco would require the plaintiffs to demonstrate that the Refinery's unlawful discharges specifically caused or contributed to the particular pollution they have observed in the River. This is not the correct test. The plaintiffs "need not show 'to a scientific certainty'" that the pollutants they observed came from Texaco's Refinery. *Powell Duffryn*, 913 F.2d at 73 n. 10. Indeed, Clean Water Act plaintiffs need not sue every party discharging into a given waterway "since the pollution of any one may be shown to cause some part of the injury suffered." *Powell Duffryn*, 913 F.2d at 72 n. 8. If we were to accept

Texaco's rule, standing could be achieved only where the polluting event was so monumental or the waterway so small that one could identify precisely the specific source of observed pollution. This would contradict the overall purpose of the Act.

We believe that the plaintiffs have shown that the injuries they allege are fairly traceable to Texaco's behavior. The *Powell Duffryn* case provides an excellent model for analyzing this question. There the court found that plaintiffs satisfied the "fairly traceable" requirement because (a) they found offensive an oily sheen on the waterway in which they had an interest, (b) the defendant's permit contained limits on oil and grease discharges, and (c) the defendant had violated the oil and grease permit limits. *Powell Duffryn*, 913 F.2d at 73. The plaintiffs here have had the same experience. Their witnesses observed oily sheens and smelled foul odors on the River in areas near the Refinery where these witnesses would like to engage in a variety of activities. Texaco's 1977 and 1989 permits contain limits on oil and grease. Texaco violated these limits during the period covered by the complaint. Texaco has not, on the other hand, provided persuasive evidence that contradicts either the member-witness's experience or the fact that these limits on oil and grease were violated. *Id.*, 913 F.2d at 73 n. 10. Thus, the plaintiffs have, as the *Powell Duffryn* court put it, "satisfied the second prong of the *Valley Forge* test." *Id.*, 913 F.2d at 73.

This conclusion is supported by the extensive testimony of Dr. Livingston, an expert witness presented by plaintiffs, about the immediate and long-term effects of Texaco's excessive discharges on the River's capacity to serve as a source of food, a sanctuary for wildlife, and a fertile ground for recreation. We found Dr. Livingston to be not only qualified to testify on these issues, but also persuasive. While Dr. Livingston did not supply empirical data regarding the specific effects of particular Texaco discharges on discrete activities, he did testify that Texaco's discharges definitely posed a real and substantial threat to the aquatic environment. Tr. 504. According to Dr. Livingston, an ecosystem such as the River is a dynamic environment, one that is affected in a synergistic manner by introduction of pollutants. The impact of a single polluting discharge is not limited to a narrow geographic area. Depending on prevailing River conditions, as well as the behavior of the organisms inhabiting the ecosystem, pollutants are transported—either physically or via the food chain—far beyond the narrow locus of their introduction into the system. In light of Dr. Livingston's testimony, we are further persuaded that the injuries complained of are fairly traceable to the Refinery.

As we will explain below, we cannot give the same credit to the testimony of Texaco's expert Lee Beetschen, who stated that there was no evidence of adverse impact. We find his methodology, and thus his resulting calculations, not to be helpful or persuasive. Moreover, even if his testimony had been helpful, it would not weigh in our decision on standing because standing is not analyzed on a strict parameter-by-parameter basis. Such an analysis would ignore both the governing Article III jurisprudence in this area and Congress's desire to encourage citizen participation in the regulation of water pollution through suits such as this one.

To summarize, we find that for purposes of analyzing the standing of the plaintiffs to sue, their injuries are fairly traceable to Texaco's conduct.

### C. *Redressability*

To clear the final hurdle to standing, plaintiffs must demonstrate that their injuries are "likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. Unlike the "fairly traceable" requirement, which addresses the connection between the plaintiff's injury and the defendant's conduct, redressability focusses on the connection between the plaintiff's injury and the judicial relief sought. *Powell Duffryn*, 913 F.2d at 73. Here the plaintiffs seek both injunctive relief and civil penalties. Texaco argues that the plaintiffs' alleged failure to demonstrate a link between their injuries and the Refinery's discharges means there is no

reason to believe that their injuries would be redressed by a judgment relating to such discharges. Texaco "is simply wrong." *Id.*, 913 F.2d at 73.

The central purpose of the Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. *Id.* Where, as here, plaintiffs complain of harm to the waters in which they have cognizable interests, an injunction barring further permit violations will at least partially redress their injury. *Id.* If Texaco complies with its permit, pollution in the River will decrease. *Id.* Similarly, the purposes of the Act will be fulfilled (and the plaintiffs' injuries redressed) if Texaco is, as the plaintiffs request, ordered to investigate and report the causes of future permit violations and sponsor a monitoring program. "Plaintiffs need not show the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III." *Id.*

There is also a strong connection between the requested civil penalties and the plaintiffs' claimed injuries. Imposition of such penalties will serve as a deterrent to Texaco and other polluters. *See id.* Pollution in a major waterway like the River "must be redressed one illegal discharge at a time, even though the impact of a favorable decision may not by itself be readily noticeable." *Public Interest Research Group of New Jersey, Inc. v. Yates Indus., Inc.*, 757 F.Supp. 438, 444 (D.N.J. 1991). Plaintiffs have demonstrated that their injuries are redressable by the relief they request.

Because we conclude that the plaintiffs have satisfied all the requisite elements for standing, we now turn to the question of jurisdiction.

## II. JURISDICTION

### A. *Parameter-by-Parameter Approach*

Earlier in this litigation Texaco moved for summary judgment on the ground that this court had no jurisdiction over the great majority of the violations alleged in the complaint. 719 F.Supp. at 287. Texaco argued that we must determine our jurisdiction over the permit violations on a parameter-by-parameter basis. We rejected this approach. 719 F.Supp. at 287. In light of the Fourth Circuit's subsequent adoption of the parameter approach, *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 697–98 (4th Cir.1989) ("*Gwaltney II*"), Texaco now asks us to reconsider our earlier ruling. We have considered carefully the views of both sides on this issue. For the reasons that follow, we will employ a variation of the parameter-by-parameter jurisdictional analysis suggested by *Gwaltney II*. The reasons for our decision to alter our prior holding follow.

#### 1. Background

##### a. *The Statute*

Other than Article III of the United States Constitution, the primary source of our jurisdiction in this case is, of course, the Clean Water Act. The Act was enacted by Congress in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a)(1). The Act prohibits the discharge of any pollutant into navigable waters except as authorized by designated sections of the statute. § 1311(a). One such designated section establishes the National Pollution Discharge Elimination System. § 1342. Pursuant to the NPDES, the Administrator of the Environmental Protection Agency ("EPA") may issue permits authorizing the discharge of pollutants in accordance with specific conditions. § 1342(a). Alternatively, a state may adopt and administer its own permit program if the program conforms to federal guidelines and is approved by the Administrator. § 1342(b). Because Delaware has a state permit program, the issuance of federal permits is suspended in Delaware. § 1342(c)(1).

The holder of a federal NPDES permit is subject to enforcement actions by the Administrator of the EPA for failure to comply with permit conditions. 33 U.S.C. § 1319. The holder of a state NPDES permit, like that at issue here, is subject to enforcement action by both the federal and

state authorities for failure to comply. §§ 1319, 1342(b)(7).

In the absence of a federal or state enforcement action, the Act authorizes interested citizens to file civil actions against an alleged violator of the terms of a state or federal permit. § 1365(a). The citizen suit provision provides, in relevant part, that:

> any citizen may commence a civil action on his own behalf—
>
> (1) against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter . . . and to apply any appropriate civil penalties under section 1319(d) of this title.

§ 1365(a). The term "effluent standard or limitation" is defined in the Act to mean "a permit or condition thereof." § 1365(f)(6).

■ As the law has evolved, it has become clear that a party seeking to file a citizen suit under the Act must overcome two jurisdictional obstacles. First, the Act itself requires that, at least sixty days before a complaint is filed, the party give notice of the alleged violation to the Administrator of the EPA, to the state in which the violation is allegedly occurring, and to the alleged violator. The second jurisdictional hurdle derives from the Supreme Court's holding in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (*"Gwaltney I"*), that the Act "does not permit citizen's suits for wholly past violations" of a permit. *Id.* at 64, 108 S.Ct. at 384–85. The latter requirement is at issue here.

### b. Gwaltney I

In *Gwaltney I* the Supreme Court held that 33 U.S.C. § 1365 (§ 505 of the Act) "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." 484 U.S. at 64, 108 S.Ct. at 385. We have already reviewed this decision in some detail, *see Texaco I* at 286, and take it into consideration below.

### c. Our Prior Decision

In light of *Gwaltney I* and *Sierra Club v. Shell Oil Co.*, 817 F.2d 1169, 1173 (5th Cir.), *cert. denied,* 484 U.S. 985, 108 S.Ct. 501, 98 L.Ed.2d 500 (1987)), Texaco urged us at the summary judgment stage to examine each parameter within each outfall independently to see if jurisdiction existed. The plaintiffs exhorted us to base our jurisdiction on the single permit and to go on to consider all violations of that permit, regardless of their date and location. We agreed with the plaintiff, finding that

> [n]othing in the language of the [Act] or the Supreme Court's opinion in *Gwaltney* supports the cumbersome jurisdictional analysis defendant insists is required. Instead, once a citizen suit has been properly commenced and subject-matter jurisdiction shown to lie, the court should be permitted to consider past, present, and potential future violations.

*Texaco I* at 287. Because the plaintiffs had shown violations of several limits, we held that we had jurisdiction over all claims relating to past, present and possible future violations. *Id.*

### d. Gwaltney II

After we filed our opinion in *Texaco I*, the Fourth Circuit ruled that the jurisdictional determination of whether violations are "ongoing or intermittent" must be made on a parameter-by-parameter basis. *Gwaltney II*, 890 F.2d at 697–98. The Fourth Circuit expressly rejected the idea that under § 1365 a court may base its jurisdiction over many *violations* on ongoing violation of a single *permit:*

> [The plaintiff] contends that the jurisdictional requirement of § 1365 refers to finding an ongoing violation of the *permit;* having done so, the court may then impose penalties for any past violation of any permit *parameter.* We do not think the statutory language can support that position. Section 1365(a) permits citizen suits against persons alleged to be in violation of "an effluent standard or limitation." Penalties under § 1319(d) may be assessed for violations of "any permit condition or limitation." The entire structure of the Clean Water Act and regulations involves identifying specific pollutants and setting a permit limit for

each pollutant of concern. It thus makes sense within this scheme to view each parameter separately for purposes both of determining ongoing violations and of assessing penalties.

*Id.* at 698. In a footnote, the *Gwaltney II* court referred to Congress's 1987 amendment of § 1319 to allow courts to impose fines "per day per violation." The same amendment added a provision that single operational upsets leading to simultaneous violations of "more than one pollutant parameter shall be treated as a single violation." These features of the amendment indicated to the Fourth Circuit that Congress "at least as of 1987," intended that non-upset violations be treated on a parameter-by-parameter basis. *Id.* at 698 n. 7. The *Gwaltney II* court went on to comment that

> [i]f Congress wished to permit citizen suits only when a discharger fails to abate a problem and the government fails to take enforcement action, ... then it would make little sense to permit penalties for wholly past violations of one parameter simply because there are ongoing violations of another parameter.

*Id.* at 698 (citation omitted).

### 2. Analysis

The parties' perspectives on the jurisdictional issue presented by *Gwaltney II* arise from divergent views of the language of the Act, the meaning of *Gwaltney I,* and matters of public policy.

The plaintiffs first aver that the *Gwaltney II* decision is inconsistent with the actual language of the Act, which provides for citizen suits against person alleged to be "in violation of ... an effluent standard or limitation." § 1365(a)(1). Noting that an "effluent standard or limitation" is defined in the statute as "a *permit* or condition thereof," § 1365(f)(6) (emphasis added), they conclude that Congress intended there to be jurisdiction over all violations of permit parameters so long as the violator is in one way or another "in violation" of the permit.

Texaco recognizes this statutory text but interprets it to require analysis of standards or limitations "as *translated into* the conditions of an NPDES permit." *EPA v. State Water Resources Control Board,* 426 U.S. 200, 223, 96 S.Ct. 2022, 2033, 48 L.Ed.2d 578 (1976) (emphasis added). Texaco also points out that § 1319(d) allows courts to impose civil penalties for violations of specified sections of the Act and for violations of "any permit *condition or limitation* implementing any of such sections in a permit." § 1319(d) (emphasis added). Texaco looks as well to § 1319(a), which authorizes government agencies to seek injunctive relief when

> any person is in violation of any *condition or limitation* ... *in* a permit issued by a State under an approved permit program....

§ 1319(a)(1). Based on this statutory language, Texaco argues that there would be no reason for Congress, despite the text of § 1365, to have made the jurisdiction available in a citizen suit for injunctive relief any broader than that available in one brought by a government agency; such an interpretation would expand the supplemental role given to citizen suits by Congress.

Texaco also points out that the EPA, under the authority delegated to it under the Act, applies a parameter-by-parameter analysis in establishing permit limits themselves. *See* 40 C.F.R. § 123.45, App. A ("Effluent violations should be evaluated on a parameter-by-parameter and outfall-by-outfall basis.") Thus, in Texaco's view, both the structure and the administration of the Act contemplate a parameter-by-parameter approach.

The plaintiffs also point to the *Gwaltney I* decision for support, noting that the Supreme Court appeared to focus on a permittee's overall state of compliance or noncompliance with the permit, not with individual parameters. *See* 484 U.S. at 56–57, 108 S.Ct. at 381. Indeed, the Court did, in discussing the need for a 60 day notice period, note that "the purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit." 484 U.S. at 60,

108 S.Ct. at 382–83. This general emphasis on complete compliance with the terms of a permit is, according to the plaintiffs, incompatible with the Fourth Circuit approach.

Texaco, by contrast, argues that *Gwaltney I* repeatedly emphasized the Act's focus on the present tense and on prospective relief. To Texaco, this factor, combined with the Supreme Court's emphasis on the limited, supplemental nature of citizen suits, dictates a parameter-by-parameter approach. Without such an approach, argues Texaco, the plaintiff could use an ongoing violation of even a single effluent limit to open up and litigate long past violations of unrelated limits. This would improperly focus the litigation on the past and interfere with the EPA's discretion on whether or not to enforce the Act with respect to past violations. Texaco also observes that the *Gwaltney I* court felt that the notice provision, which allows violators to come into complete compliance before suit is brought, would be rendered superfluous if the courts had jurisdiction over violations that had occurred wholly in the past.

The final source of support to the plaintiff's critique of *Gwaltney II* is the general policy interest in having citizens supplement governmental enforcement so that full compliance with the Act is accomplished through full compliance with permits. The plaintiffs are concerned that adoption of the *Gwaltney II* approach could result in dismissal of citizen claims before there is an opportunity to develop proof, including evidence of defendants' failure to investigate and report causes of permit violations. The plaintiffs are concerned that the jurisdictional inquiry would become a "mere parameter by parameter scan of a violations list."

In response to plaintiffs, Texaco points out that the Supreme Court has expressly rejected the idea that the scope of a citizen suit should be coextensive with that of a government suit. *Gwaltney I*, 484 U.S. at 58–59, 108 S.Ct. at 381–82. As to the claim that a parameter approach might impede full enforcement by precluding discovery, Texaco states that there would be no rea-

son to preclude discovery. Finally, Texaco avers that litigation of citizen suits would be speeded, not slowed, by the parameter approach because wholly past violations would be jettisoned, thus streamlining the litigation.

■ Having reconsidered the jurisdictional issue in light of developments since our ruling in *Texaco I*, we conclude that constricting jurisdiction to the *Gwaltney II* "parameter by parameter" standard is too narrow, but, on the other hand, that permitting one current violation to open a citizen's suit up to review of all past violations of all parameters is too broad. At the trial of this case, we heard extensive testimony of the synergistic and cumulative effect of pollutants. We also heard how problems with different aspects of the refining process, such as the sourwater stripping plant or the bacteria in the biomass or the effects of extremely cold temperatures, could cause violations in a variety of one or more parameters. Moreover, the failure of the refinery adequately to identify the cause of such a violation or to take sufficient remedial measures to prevent its recurrence can cause continuing compliance difficulties. If these ongoing violations are related to the basic underlying problem, the fact that past violations show up in one parameter and a post-complaint violation occurs in a different parameter, should not, under our reading of *Gwaltney I*, deprive us of jurisdiction in a citizen's suit to grant a remedy for what is essentially the same, inadequately resolved source of difficulty.

We believe that public policy, at least as enunciated in the Act and in *Gwaltney I*, favors judicial pressure to fully comply with permit limits. These sources of policy do not encourage adjudication of violations that cease well before a complaint is filed. However, they do demand the effective means of correcting underlying causes of violations be identified and implemented. If appropriate remedial measures are not taken, the fact that the failure to solve the problem is manifested from time to time in different parameters should not preclude a citizen's suit directed at the unresolved source of trouble. We find this conclusion

consistent with *Gwaltney I*, where the Court noted that good faith *allegations* of ongoing or intermittent violations would suffice, at least until trial. At trial it becomes the plaintiff's responsibility to prove that the alleged violations were ongoing or intermittent. *See also Gwaltney II*, 890 F.2d 690, 697 (remanding for jurisdictional inquiry at penalty phase). We conclude further that the interrelationship of violations with a continuing problem and/or failure to remedy it must be demonstrated. In this way, citizen suits, like the present one, will neither be dismissed prematurely nor limited by an unrealistic focus on a particular parameter.

■ A further consideration we must deal with under the holding of *Gwaltney I* is the extent to which risk of further violation must be demonstrated. We conclude that the plaintiffs need only show for each parameter, or for each parameter dependent upon a basic underlying source of violations, that the risk of further violation had not been "completely eradicated" at the time the complaint was filed.

### B. *Application of Parameter Model to The Present Case*

Having established the standard by which we will determine whether a violation was "intermittent and ongoing" or "wholly past" at the time the complaint was filed, we will now apply that standard to the violations in this case. For the sake of convenience, this sorting process will be divided into two separate steps. First, we will examine the post-complaint violations in order to determine whether the relevant parameters were being violated on an "ongoing or intermittent" basis. This will nec-

essarily require some analysis of Texaco's proffered defenses to these violations. In the second stage of our analysis, we will examine those parameters for which there were no post-complaint violations to see if they otherwise fit within the jurisdictional tests outlined above. Violations not fitting into either category will be considered "wholly past" violations over which this Court has no jurisdiction.

#### 1. Parameters Violated After the Complaint Was Filed

■ One way for a citizen plaintiff to establish the existence of ongoing violations is simply by proving violations that continue on or after the date the complaint was filed. In the present case, plaintiffs allege that forty-two (42) post-complaint violations of pre-complaint parameters occurred.[5] These alleged violations correspond to three hundred twenty-three (323) pre-complaint violations.

■ In the hope of reducing the number of post-complaint violations that can be used to establish jurisdiction over pre-complaint violations, Texaco offers a number of substantive defenses to the post-complaint violations. We find these defenses to be without merit. First, Texaco asserts that three post-complaint exceedances (nos. 365, 377, and 379)[6] were due to "sampling and testing errors." In *Texaco I*, we held that this defense raised no genuine issue of material fact. 719 F.Supp. at 288–89. We then commented that:

> Regardless of the credibility of the proof that the defendant has submitted, defendant's sampling error defense conflicts with the legislative motivation behind the [Act].... "If an entity reports a pollution level in excess of the Permit limits,

---

5. These violations are of the following parameters: Outfall 002—TSS, TOC; Outfall 101—Oil & Grease, TSS; Outfall 201—Flow, TOC; Outfall 501—pH, Iron, Oil & Grease, and TSS; Outfall 601—Ammonia, BOD. After January 1989, various parameters were monitored at outfall 601 rather than at outfall 101. We agree with the plaintiffs that, because these monitoring points represent the same waste stream, there is no basis for distinguishing between them for the purpose of determining continuing violations. In determining whether violations were ongoing, intermittent, or wholly past in nature, we

shall treat post-complaint violations at outfall 601 as if they were violations of the same parameter limits at outfall 101. The post-complaint violations at outfall 601 correspond to 101 pre-complaint violations at outfall 101.

6. In keeping with the numbering system set forth on amended PEX 68, the November 28, 1990, Oil and Grease violation at outfall 101 shall be considered violation number 378, while the February 2, 1991, TOC violation at outfall 201 shall be considered violation number 379.

it is strictly liable, as Congress has manifested an intention that the courts not reconsider the effluent discharge levels reports." ... Defendant's complaints regarding the accuracy of the government-imposed testing method contained in its permit should have been made during the period set aside for appeal of the permit's terms. It is, of course, too late for the defendant to do so now.

*Id.* (quoting and citing *Connecticut Fund for the Environment, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1417 (D.Conn.1987)). At trial we heard nothing in the way of legal argument or factual evidence that persuaded us to alter this conclusion. Indeed, we found Texaco's evidence of alleged sampling and testing errors to be weak and incredible. The sampling and testing error defense therefore is without merit as to any and all of the violations at issue in this case, regardless of their date.

 The second Texaco defense to the alleged post-complaint violations in the company's claim that the exceedances leading to violations 354, 355, and 356 were "the result of a lost sample as indicated on the DMR." This defense also lacks merit. While the terse notations "Sample lost except for metals analysis" appears on the relevant DMR, the same document contains clear measurements of other pollutants. *See* PEX 58 at 6. In light of this fact, we do not accept the bald assertion that the sample was lost. Acceptance of this defense would encourage polluters to "lose" samples that are required by the NPDES permit system when the results might not be favorable. Because the Act contemplates strict compliance with testing requirements, the "lost sample" defense will not be accepted absent far more compelling prove than that presented here.

The third Texaco defense pertains to many pre-complaint violations, but only to one post-complaint violation, number 379 (TOC at outfall 201). Here Texaco claims that the test result obtained was a "statistical outlier," or an aberrational value that is to be expected from time to time. In *Texaco I,* we rejected this defense, 719 F.Supp. at 289. We see no reason to change our

position. Because we do not wish to lend credibility to a defense that is impermissible for the reasons articulated in *Texaco I,* we hesitate to elaborate on that opinion. Nevertheless, we do note that trial testimony exposed the fact that Texaco had undertaken no statistical analysis of the data it received and was merely relying on the equivalent of hunches when it labelled certain exceedances "outliers." There is thus now even less reason to entertain this defense. It is, like the "sampling and testing error" defense, without merit as to any and all violations at issue in this case.

The remaining defense is Texaco's contention that many of the post-complaint violations were due to so-called "system upsets." In *Texaco I,* we held that Texaco was barred from asserting this "upset defense" under its 1977 NPDES permit, which makes no reference to such a defense. 719 F.Supp. at 289 (40 C.F.R. § 122.41 provides that under a state-issued permit, the upset defense must be incorporated into the permit expressly or by reference to C.F.R. sections). Texaco's 1989 permit, however, specifically allows Texaco to assert this defense, as it now does. Under EPA regulations, an upset is defined as "an exceptional incident in which there is unintentional and temporary noncompliance with technology based permit effluent limitations because of factors beyond the reasonable control of the permittee." 40 C.F.R. § 122.41(n)(1). An upset does not include "noncompliance to the extent caused by operational error, improperly designed treatment facilities, inadequate treatment facilities, lack of preventive maintenance, or careless or improper operation." *Id.*

 To establish this defense to a permit violation, the permittee must demonstrate that (a) an upset occurred due to an identified cause, (b) the facility was being properly operated, (c) notice was given within 24 hours, which notice included a description and cause of noncompliance, exact dates of noncompliance, the anticipated time of continued noncompliance, and steps taken or planned to eliminate and prevent recurrence, and (d) remedial measures were

taken to prevent or minimize noncomplying discharges. *Id.* § 122.41(n)(3). Texaco, like any permittee, has the burden of proving the existence of a system upset.

▇▇▇ Texaco considers the following phenomena to be system upsets under the 1989 permit: a leaking check valve (violations 363 and 364); pluggage in the stripping column of the sour water stripper (violations 366 and 367); unidentified problems with the final clarifiers of the wastewater treatment plant (violation 368); a buildup of solids in the clarifiers upstream of the filters (violations 369 and 370); problems with the desalters that caused a buildup of oil in the clarifiers (violations 371 through 371); and failure of the pumping system at the dissolved air flotation tanks, coupled with excess foaming (violations 375 and 376). Having heard all the evidence pertaining to these particular events, we are not convinced that they were either exceptional or beyond the reasonable control of the Refinery. Texaco, in other words, has not met its burden of proof regarding the upset defense.

To summarize, we find that forty two (42) violations of various permit levels occurred after the filing of the complaint in this matter. These forty two (42) violations correspond directly to, and thus provide jurisdiction over, three hundred twenty-three (323) pre-complaint violations.

### 2. Parameters Violated Only Before the Complaint Was Filed

▇▇▇ There are forty nine (49) pre-complaint violations that do not correspond to any of the post-complaint violations just discussed. The jurisdictional question presented by these violations is whether the plaintiffs have presented evidence from which we could find a continuing likelihood either that that same parameter would be violated or that the inadequately corrected source of that violation would likely cause a future violation of another of the permit's parameters. Having reviewed the evidence in some detail, we find that at the time of the filing of the complaint there

was no real risk that these parameters would be violated again or that they were caused by as yet unresolved sources of difficulty. We therefore have no jurisdiction over these "wholly past" violations.

### a. *Outfall 001*
#### (1) *Flow*

There were only three violations of this parameter (nos. 30, 43, and 86a) before the complaint was filed. The last of these fell on December 22, 1983. More than four years elapsed before the complaint was filed. This fact alone leaves the plaintiffs hard pressed to argue that violation of this parameter was "ongoing" in 1988.

On the other hand, it does not preclude the possibility that the violations were intermittent, i.e., "coming and going at intervals" or "not continuous." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 632 (1986). For violations to be "intermittent" they need not appear at regular and predictable intervals; this would make them "ongoing." Rather, "intermittent" violations appear randomly and unpredictably. There is a sense, however, in which the passage of time reduces to nil the realistic chance of repetition of even the most random violations. In the face of such passage of time it is the plaintiff's burden to prove that the risk of a repeated violation of the parameter has not been completely eradicated. As the *Gwaltney II* court pointed out, this proof can consist of evidence that remedial actions were taken to cure violations of that parameter, an evaluation of the *ex ante* (or "prospective")[7] probability that such measures would be ineffective, or any other kind of appropriate evidence.

Returning to outfall 001 flow violations, we find that the plaintiffs have not met their burden of proving that the risk of such violations had not been "completely eradicated." At trial they presented evidence that the causes of some violations were uncertain, as well as evidence that

---

**7.** *See* B. GARNER, DICTIONARY OF MODERN LEGAL USAGE 227 (1987) (distinguishing *ex* *ante* from *ex post* ).

there were continuing operational problems with plant overloads, the sour water stripper, cold weather, and reporting and monitoring of violations. A failure to investigate causes could, in the plaintiffs' eyes, mean that no remedial measures were taken. Likewise, the existence of continuing mechanical problems could be interpreted to mean that everything was "business as usual" at the refinery, and that no change could reasonably be expected. We conclude that this vague presentation by plaintiffs is not sufficient to demonstrate that we have jurisdiction over these outfall 101 flow violations as being due to an unresolved underlying problem.

The plaintiffs have, on the other hand, successfully shown that the continuing sourwater stripper problems made it likely that ammonia violations would occur, but we have already determined that we have jurisdiction over the pre-complaint ammonia violations by virtue of the existence of post-complaint violations.

We do not mean to rule out the possibility that long periods of time may pass between "intermittent" violations. However, the plaintiffs here have made no effort to demonstrate that this may be the case. Thus, the plaintiffs have not convinced us that a reasonable trier would find that the flow violations at outfall 001 were likely to recur. They are simply too remote in time from the complaint. We have no jurisdiction over these flow violations.

#### (2) pH

There were six pre-complaint violations of the pH parameter at outfall 001, the last of which occurred in the month of May 1985. Three more years passed before the complaint was filed. Because plaintiffs have not demonstrated to our satisfaction that there was a real likelihood that this parameter will be violated again, we find we have no jurisdiction over these six violations.

#### b. Outfall 002
#### (1) Oil and Grease

There was only one violation of the Oil and Grease parameter at outfall 002. It occurred in the month of November 1983.

For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over this violation.

#### (2) BOD

There were five violations of the BOD limit at outfall 002, the last of which occurred in the month of November 1984, some three and one-half years before the complaint was filed. For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over these violations.

#### c. Outfall 101
#### (1) TOC

There were fifteen pre-complaint violations of the TOC limit at outfall 101. The last violation in this category occurred on January 6, 1984, more than four years before the complaint was filed. For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over these violations.

#### (2) Phenols

There were eight pre-complaint violations of the phenols limit at outfall 101. The last violation in this category occurred in the month of December 1983, more than four years before the complaint was filed. For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over these violations.

#### (3) Sulfides

There were two pre-complaint violations of the TOC limit at outfall 101. The last violation in this category occurred on January 25, 1985, more than three years before the complaint was filed. For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over these violations.

#### d. Outfall 401
#### (1) pH

There were six pre-complaint violations of the pH limit at outfall 401. The last violation in this category occurred in the month of May 1985, approximately three years before the complaint was filed. For the reasons stated in section II.B.2.a.1

above, we find we have no jurisdiction over these violations.

### (2) *Bioassay*

There was one pre-complaint violation of the bioassay limit at outfall 401. This violation occurred in the month of April 1984, more than four years before the complaint was filed. For the reasons stated in section II.B.2.a.1 above, we find we have no jurisdiction over these violations.

### 3. Summary

We find that we have jurisdiction over three hundred twenty-three (323) of the three hundred seventy-two (372) pre-complaint violations alleged by the plaintiffs. We lack jurisdiction over forty-nine (49) of the pre-complaint violations.

In addition, we have jurisdiction over the forty-two (42) violations that occurred after the complaint was filed. This means that we have jurisdiction over three hundred sixty-five (365) of the violations alleged by the plaintiff.

Our next task is to decide any liability issues that remain after our present and earlier opinions.

## III. LIABILITY

Our decision in *Texaco I*, combined with our discussion above of the various defenses raised by Texaco, firmly establishes liability for the vast majority of the violations over which we have jurisdiction. There are, however, a few matters remaining. We turn first to the simplest of these issues.

### A. *Alleged Reporting Errors*

 With regard to violation 157, Texaco claims that there is a discrepancy between the reported TSS value on the DMR and the value indicated on a summary of test results. PEX 367. Texaco employee Richard Ladd testified that the DMR value was an "error," and that the lower, non-violating measurement is correct. We do not accept this analysis. The DMR, which is the key reportage document in the administrative scheme set up by the Act, must control unless there is convincing evidence of an error. Here the summary of

test results relied upon by Ladd is merely a competing source of the same information. It does not convince us that the DMR is in error. In this circumstance, we will rely on the DMR value, and violation 157 stands.

We have a similar view of Texaco's argument with regard to violation 173. Here Texaco claims that the correct value appears in Texaco's NPDES log (DEX 66) at page 69. We do not find this value reported on this page. Thus, we accept the value reported on the wastewater analysis sheets, DEX 72 at 009148, and violation 173 stands.

Texaco argues with regard to violation 220a (flow at outfall 201) that the DMR was inadvertently left blank, and that the actual flow value was well within the limit. For proof of the latter assertion, Texaco refers us to a chart prepared by Texaco for this litigation. *See* DEX 351. This highly indirect evidence, if it is probative at all, does not persuade us that violation 220a should be deleted. The violation therefore stands.

A similar argument is made regarding violation 232 (TOC at outfall 002), where the DMR reported an exceedance of the limit. Texaco argues that the underlying data reflect an actual figure that is below the limit. The basis for this conclusion is the NPDES log and Ladd's testimony that he had recalculated the underlying data and that the reported figure was an "error." Tr. 2061. Given the paucity of Ladd's testimony on this subject, we are unable to reach the same conclusion from Defendant's Exhibit 67. Violation 232 shall not be disturbed.

A related Texaco parry pertains to violation 268 (failure to report re: oil and grease at outfall 501). Texaco does not explain why this should not be a violation, so we shall not disturb its present status.

### B. *Flow Violations*

 Texaco disputes that the 17 alleged flow violations at outfall 201 and the two alleged violations at outfall 001 constitute violations of the permit. According to the plaintiffs, these are violations of daily average permit limits. The 1977 permit itself

states that "[t]he *average* quantity of effluent discharged from the wastewater treatment facility shall not exceed 334 million gallons per day (mgd) or 1,264,190 cubic meters per day." PEX 1 at 5 (outfall 201) (emphasis added). Texaco interprets this to require averaging over an entire year, while the plaintiffs average daily flow measurements taken over a month. We find the plaintiffs' interpretation of the permit the more viable one because all other permit limits are phrased in either daily or daily *average* maximums. Daily "average" is defined in the permits as the average result of all daily measurements taken in a single month. The only reasonable interpretation of the flow limit is that it requires averaging of all flow measurements from a single month. Thus, the flow violations alleged by the plaintiffs are legitimate. In the absence of some other defense, they shall not be disturbed.

### C. *Duplication of Outfalls 401 and 001*

■■■ Another defense proffered by Texaco is that because the limits at outfalls 401 and 001 are identical and are measured against the same sample, a violation at one outfall "ends up being counted as two violations." We are not sympathetic. The permit clearly lays out separate parameters for each of the two outfalls. This scheme controls not only reporting, but also liability. To render one outfall superfluous would be to contradict the broad regulatory goals of the statutory and administrative system of regulation set up by Congress. We therefore shall treat these outfalls separately for liability purposes.[8]

### D. *"Double Counting"*

■■■ The final issue raised by Texaco is its general claim that the plaintiffs have "double counted" a number of the violations. For each parameter at outfalls 101 and 501, a single sample is taken from which the concentration is determined. That concentration is then multiplied by the flow on that day to determine the weight or "load." It strikes Texaco as unfair to allow the plaintiffs to count the concentration and weight values as two violations because "[u]nless there is an exceptionally low flow during a day, every concentration exceedance will result in a corresponding weight or quantity exceedance." For support, Texaco relies on the fact that a representative of DNREC, which issued the permit, considered such an instance to constitute a single violation. Tr. 1369, 1373–74, 1422 (Janiga). We cannot accept Texaco's argument in this regard. The permit, which is issued by a state agency through a delegation of power by the United States Congress, plainly prohibits exceedances of both concentration and weight limits for many parameters. The mass (or loading) limitations are based on EPA's petroleum refining effluent guidelines. The concentration limitations are derived by DNREC by applying Texaco flow data to the loading limits. Concentration and loading limits are written into the permit as discrete limits. Tr. 1424 (Janiga). Each limit has a specific regulatory and environmental function. Tr. 1429 (Janiga). One purpose of the concentration limitation is to retain removal efficiency even if the volume of flow declines. Tr. 1417–18 (Janiga). One purpose of the loading limits is to define the total mass of any pollutant that can be discharged into the receiving waters, regardless of its concentration. This avoids meeting the limits by dilution. Tr. 58 (Bell).

Moreover, EPA regulations provide that when pollutants are limited in terms of mass as well as terms other than mass, "the permit shall require the permittee to comply with both limitations." 40 C.F.R. § 122.45(f)(2). If Congress and the EPA had intended exceedances of both limits to be counted as one violation, they would

---

**8.** This is not in conflict with our earlier decision to consider the results of measurements at outfalls 101 and 601 to be related for purposes of analyzing whether violations were ongoing, intermittent, or wholly past. Our jurisdictional analysis reflects Congress' desire to end current pollution by means of citizen suits. In light of this goal, it makes sense to consider two highly related outfalls together for purposes of analyzing whether pollution is currently emanating from a common, and perhaps indistinguishable, source.

have made this fact clear. It is true that the 1977 permit defines "daily average" and "daily maximum" in terms of discharge by weight, *see* PEX 1 at 16, but the same document mentions maximum instantaneous *concentration* of a given pollutant. *Id.* ¶ 3.c. As the Third Circuit has noted, "[t]hese are clearly separate limitations and we see no reason why [the defendant] should not be penalized separately for violating each limitation." *Powell Duffryn,* 913 F.2d at 78. In these circumstances, we feel that the most rational interpretation of the document in light of the purposes and terms of the Act (which expressly contemplates penalty for discrete violations of effluent standards or limitations) is that separate exceedances of weight and concentration limits can constitute separate violations.

E. *Summary*

Because we have rejected Texaco's defenses to liability for the three hundred sixty-five (365) violations over which we have jurisdiction, Texaco is liable for all.

## IV. DETERMINATION OF PENALTIES

We next must determine what civil penalties are appropriate in light of the violations committed by Texaco. This is a multi-step endeavor. First, we must calculate the maximum penalty for each violation. This is complicated because Texaco has violated not only daily maximum limits on pollutants, but also daily average limits during entire months. After determining the maximum penalties available, we then must analyze a number of largely qualitative factors in arriving at a final figure.

A. *Calculation of Days of Violation*

Before February 4, 1987, 33 U.S.C. § 1319(d) provided that:

> Any person who violates ... any permit condition or limitation ... shall be subject to a civil penalty not to exceed $10,-000 per day of such violation.

This section was amended on February 4, 1987 to provide that violators "shall be subject to a civil penalty not to exceed $25,000 per day for each violation." Texa-

co thus is subject to a maximum penalty of $10,000 per day for each permit violation occurring before February 4, 1987 and $25,000 per day for each permit violation occurring on or after that date.

Before we reach the ultimate calculation of the maximum possible penalty, we must first lay out how these violations will be counted.

1. Calculation of Number of Days of Violation for Each Exceedance of a Daily Average (Monthly) Limitation

▬ Exceedance of a daily average limitation constitutes a violation for each day of the month, or from 28 to 31 days of violation. *Atlantic States Legal Found., Inc. v. Tyson Foods,* 897 F.2d 1128, 1139–40 (11th Cir.1990); *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 313–15 (4th Cir.1986). *See also Powell Duffryn,* 913 F.2d at 79 n. 29 (raising issue). These maximum penalties may be imposed for *each* daily average limitation violated during a given month. *Tyson Foods,* 897 F.2d at 1140 n. 22. This mode of assessment is consistent with the rationale underlying daily average limits. Such limits recognize that discharges will not be constant. However, over the period of a month, a permittee is required to keep the average discharge of a given pollutant down to the daily average limit. The violation of such a limit reflects excessive discharges throughout a month-long period.

2. Calculation of Number of Days of Violation for Each Exceedance of a Daily Maximum Limitation

▬ Section 1319(d) expressly imposes a penalty per day of violation rather than per violation. We therefore shall consider each exceedance of a daily maximum limitation to be the equivalent of one day of violation.

The plaintiffs would have us adopt a method of calculation that attributes more than one day to each violation of a daily maximum limitation where the pollutant is not being measured continuously or on a daily basis. For example, a violation detected under a three-times-per-week monitoring regimen should, in their view, count

as 2.3 days of violation. Plaintiffs assert that this method of assessing penalties is "required by" the Texaco permits. This is simply not the case. The portion of the permit text relied on by the plaintiffs simply states that "[s]amples and measurements taken as required herein shall be representative of the volume and nature of the monitored discharge." PEX 1, p. 16, ¶ D.1. (1977 permit); PEX 2, p. 18, ¶ E.1. (1989 permit). While it may be true, as the plaintiffs insist, that this language encourages frequent sampling and monitoring, it cannot reasonably be read to require the analysis propounded by the plaintiffs. We do not accept the plaintiffs' warning that limiting the days of violation to the days on which exceedances are actually detected would "undoubtedly undercount the number of days on which the violations occur." The permit outlines in detail the frequency with which Texaco must sample, and we are not empowered to require more. Nor are we empowered to impose penalties where there is utterly no evidence of a violation.

3. Calculation of Number of Days of Violation When Both Daily Maximum and Daily Average Violations Occur For the Same Parameter in The Same Month

■ Daily maximum violations and a daily average violation may occur for the same parameter during the same month. We read *Powell Duffryn* to support the position that both daily maximum and daily average violations of the same parameter within the same month may be counted in computing the total days of violations to be penalized.

B. *Determination of Maximum Penalty*

In light of our rulings regarding calculation of days of violation, we now must calculate the maximum penalty available for the three hundred sixty-five (365) violations for which Texaco is liable. Our calculations, based on our reasoning above, give us a total of 3360 violations days for which a fine will be imposed.

C. *Statutory Analysis*

A penalty is mandated by the Act for each violation for which liability is found. 33 U.S.C. § 1319(d) ("Any person who violates ... any permit condition or limitation implementing any of [certain sections of the Act] in a permit ... issued by a State ... *shall* be subject to a civil penalty ...."); *Tyson Foods*, 897 F.2d at 1141–42 (error not to impose penalties even where defendant displayed good faith); *Stoddard v. Western Carolina Regional Sewer Authority*, 784 F.2d 1200, 1208 (4th Cir.1986); *contra Proffitt v. Lower Bucks County Joint Mun. Auth.*, 1988 WL 48552 (E.D.Pa. May 12, 1988) (imposing no penalty) (Newcomer, J.); *Proffitt v. Bristol Township Auth.*, 28 E.R.C. (BNA) 1329, 1988 WL 48556 (E.D.Pa. May 12, 1988) (same) (Weiner, J.).

■ Section 1319(d) sets out the factors a court must consider when determining the appropriate size of a civil penalty:

In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require.

33 U.S.C. § 1319(d). Although this specific language was not incorporated into § 1319(d) until the 1987 amendments of the Clean Water Act, the statutory factors should be applied to violations occurring before those amendments. *SPIRG of New Jersey v. Hercules, Inc.*, 29 E.R.C. 1417, 1418, 1989 WL 159629 (D.N.J.1989). Such application is appropriate in light of the fact that Congress in 1987 was merely codifying a procedure that had already been employed by the courts and the EPA. *Id.* at 1418–19. The statutory maximum penalty serves as a reference point for courts in their evaluation of the factors enumerated in § 1319(d). *See Tyson Foods*, 897 F.2d at 1142 ("if [the district court] chooses not to impose the maximum, it must reduce the fine in accordance with the factors spelled

out in section 1319(d)"). We have duly considered these six statutory factors and find that far less than the statutory maximum penalty is appropriate here. What follows are the Court's findings of fact and conclusions of law regarding all of these factors.

### 1. Findings of Fact

#### a. Seriousness of Violations, Number and Nature

The plaintiffs have proved that Texaco committed three hundred sixty-five (365) violations of the 1977 and 1989 permits from March 1983 through February 1991. We find that these violations were fairly serious in terms of their size, duration, and frequency.

The first aspect of the seriousness of the violations is their number and continuous nature. There were violations of a wide spectrum of parameters. Many of these violations were for exceedances of daily average limitations, meaning that the violation occurred over the course of an entire month. While the violations were particularly heavy in the years 1983 and 1984, they did not cease. On the other hand, the number of violations per year did decline markedly as the latter half of the decade of the 1980s progressed, as did the number of monthly violations (with the exception of the Iron and Flow parameters). Texaco argues that the violations were relatively insignificant in light of EPA's purported expectation that any polluter will violate permit limits from 1% to as much as 5% of the time. See Natural Resources Defense Council v. U.S. EPA, 859 F.2d 156, 207 (D.C.Cir.1988) (describing EPA's method of setting permit levels); DEX 115, p. 17 (EPA Training Manual) (stating EPA's statistical expectations with regard to compliance with permit limits). We do not accept this argument. The terms of the permit explain what is and is not a violation, not EPA documents used to train regulators to set permit limits. Moreover, these documents do not account for the size, duration, and frequency of particular violations. We therefore find that these documents are irrelevant to the issue of seriousness of the violations committed in the present case.

Texaco's internal investigation practices also provide some evidence of the seriousness of the violations. The Act and the permits require Texaco to investigate and report the causes of violations. As demonstrated at trial, investigation of the causes of violations was the responsibility of Richard Ladd. While Mr. Ladd's practices were not, as the plaintiffs imply, reckless, they were certainly inconsistent and less than thorough. There was evidence that Ladd and his employees often relied on supposition rather than investigation in determining the causes of violations. They had no coordinated plan and frequently cut short their investigations without consulting the refinery lab, the operations department, the process engineers, and other personnel. In addition, their 5–day letters were often inadequate, with violations attributed to "sampling and testing errors" and "system upsets" of various kinds, even though neither phenomenon is an excuse provided by the 1977 permit. On many occasions, there were other possible causes of the violations that were neither investigated nor reported. On the other hand, as Texaco points out, DNREC never objected to Texaco's characterization of the causes of violations.

The seriousness of these violations is also linked to the extent to which they threatened harm to the River's ecosystem. Dr. Livingston testified that these discharges posed a definite threat to the River through contamination of sediments, water, and plant and animal life. He outlined how the excess pollutants had lasting effects on the ecosystem, with a particularly serious toxic effect occurring in the 1983–84 period. The effects of excess discharges are synergistic and cumulative in nature. He also outlined the specific effects of six pollutants: Oil and Grease, Ammonia, Phenols, TSS, BOD, and TOC. In addition, he commented that temperature changes in particular may have adverse effects. As Texaco points out, however, Dr. Livingston conceded that certain violations—namely pH and Iron—probably had no effect and stated that he was not concerned about others.

Texaco's perspective is that there is no evidence of adverse impact on the environment. Texaco's expert witness Lee Beetschen, a consultant with no background in biology, ecology, or other relevant scientific fields, compared the discharge levels to EPA water quality criteria and his own estimate of the River's assimilative capacity. Using this method, Beetschen determined that because in his estimate no discharge exceeded the EPA criteria or the River's assimilative capacity, there was no adverse impact on the ecosystem. As we have already noted, we do not give much credit to this testimony. Beetschen is not qualified to testify to the likely adverse impact of the exceedances on the River; his role was to calculate. While neither we nor the plaintiffs challenge the accuracy of his calculations, they do not persuade us that no adverse impact occurred.

■ We therefore reject Texaco's contention that no penalty is appropriate because the plaintiffs have failed to prove actual adverse impact. Congress has stated that the objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the nation's waters. The EPA itself recognizes that all pollutants create some harm or risk and that it is hard to quantify precisely that harm or risk. *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1167 (D.N.J.1989) (citing EPA Civil Penalty Policy), *rev'd on other grounds*, 913 F.2d 64 (3d Cir.1990). So long as the plaintiffs have proved that there is at least a potentially destructive impact on the waterway, penalties are not inappropriate. *Id.*

If we were to accept Texaco's view and require the plaintiffs to collect field data (a task that is, as we shall discuss, arguably Texaco's), citizens would be greatly deterred from bringing suit against violators. What is more, if we required specific proof that particular violating discharges caused discrete, identifiable harms, we would encourage a permittee to ignore the requirements of its permit "with impunity so long

as it discharged into already polluted waters." *Id.*

In sum, we give greater weight and credit to Dr. Livingston's testimony than to Beetschen's on the issue of adverse impact. In this light, we find that there is ample evidence that many of the violations had an actual or potential adverse impact.

### b. Economic Benefit

With regard to possible economic benefit enjoyed by Texaco as a result of the violations, plaintiffs do not claim that Texaco has refused to install, or delayed installing, proper pollution control equipment. Instead, they claim that Texaco derived an economic benefit from failing to have an environmental monitor and failing to conduct an extensive monitoring program. They derive this claim from the 1977 permit, which states in pertinent part that:

> The permittee shall take all reasonable steps to minimize any adverse impact to waters of the State resulting from this permit, including such accelerated or additional monitoring as necessary to determine the nature and impact of the noncomplying discharge.

PEX 1 at 18. *See also* PEX 2 at 24 (1989 permit). According to the plaintiffs, Texaco must first know what "adverse impact" exists before it can take reasonable steps to minimize it. A monitoring program is the only way to acquire such knowledge and implement the "reasonable steps" in a coordinated fashion.

At trial there was evidence that Texaco made no attempt to understand the impact of its discharges on the waters of Delaware and/or the United States. Moreover, there was evidence that Texaco took no steps—other than normal operation of the plant—to minimize possible impact; normal operation is covered in a separate section of the permit. *See* PEX 1 at 18 ¶ 3. Finally, there was evidence that Texaco has attempted to monitor the "nature" of the noncomplying discharges but has never attempted to monitor the "impact" of the same. Thus, it would appear that Texaco has failed to abide by this section of the permit.

Whether the permit requires the monitoring program requested by the plaintiffs is another issue. Dr. Livingston described a program that involved scientific evaluation of the discharge area, establishment of sampling stations, examination of species for levels of chemicals, quarterly sampling of organisms, and special occasional sampling. *See* Tr. at 555–75. He did not know whether the permit required this type of program, but interpretation of the permit was not his role. Texaco does point out in this regard that Mr. Janiga, a DNREC representative, testified that such a program was not required. Regardless of Janiga's view of the permit, we believe that its plain language requires Texaco to take affirmative steps to ascertain and mitigate any adverse impact of its nonconforming discharges.

Texaco protests that, even if the permit requires monitoring of the adverse impact of the nonconforming discharges, there is no evidence that such activity would require additional personnel and programs. We agree with Texaco to some extent. The required monitoring tasks could, in theory, be performed with existing personnel and facilities. Nevertheless, it seems plain to us that, if Texaco's environmental group had no consistent and predictable method of investigating the causes of permit violations, it could not be expected, in its present state, to handle the environmental monitoring required by the permits. We therefore believe that, while the permit does not mandate that there be a person known as the "environmental monitor," in Texaco's case additional personnel or organizational structures may be required to accomplish these tasks.

There was evidence that Texaco benefitted to some extent from its failure to undertake these tasks. Each party presented expert testimony on the size of the economic benefit conferred on Texaco as a result of its failure to monitor the impact of the nonconforming discharges. These experts built into their calculations different assumptions regarding inflation, opportunity costs, and tax rates. The plaintiff's expert, Dr. Kavanaugh, calculated that the monitoring program requested would cost $1,592,517, while the defendant's expert, Dr. Donnelly, thought the program would cost $895,588. With regard to the cost of a "monitor," Dr. Kavanaugh reached a figure of $606,667, while Dr. Donnelly reached a figure of $351,292. We find Dr. Donnelly's methods of calculation to be the more credible. We also find that Texaco's existing facilities may be able to absorb some of the costs that both experts were projecting.

In these circumstances, we find $900,000 to be a fair approximation of the economic benefit enjoyed by Texaco as a result of its failure to abide by the permit's monitoring provisions. The fact that Texaco has ignored its responsibility to monitor the impact of its violations argues in favor of imposition of a heavier fine.

### c. History of Violations

As we have already noted, from 1983 through 1991 the number of violations committed by Texaco dropped significantly. On the other hand, the violations have been spread throughout these years.

In our view, Texaco has historically exhibited a willingness to solve nagging and persistent problems with regard to particular parameters. This was true even before the issuance of the 1977 permit, when Texaco was operating under a consent order. Texaco did, however, violate that order on a number of occasions. The pre-permit history of violations comports with the post-permit trend toward gradual reduction in the number and size of the violations. Thus, while we find that Texaco has consistently violated its permit, its violations have historically declined in number and size. This argues against imposition of the maximum possible penalty.

### d. Good Faith Efforts To Comply

There is evidence in the record that Texaco has made good faith efforts to comply with the permit limits. Its overall record demonstrates that the number and severity of violations shrank as time went on. In addition, there is evidence that the Refin-

ery generally kept its discharge levels well below the parameter limits. *See* DEX 351.

Plaintiffs, on the other hand, assert that Texaco acted in bad faith in four specific areas: (1) resolution of an ammonia problem in the 1970s; (2) production of data to DNREC in connection with its application for what would become the 1989 permit; (3) failure to investigate and report the causes of violations; and (4) conduct during the litigation. While there is evidence that Texaco may have been remiss in each of these areas, we do not feel that it rises to the level of bad faith.

First, with regard to the ammonia problem, it is true that it took Texaco some eight years to solve a problem it considered to be pressing. On the other hand, there is also evidence that the company worked assiduously to obtain and install the best available technology in the area. Texaco experienced a number of problems with the sourwater stripper even after its installation, but there is no evidence of bad faith there.

Second, there is some evidence that Texaco, through Mr. Ladd, delayed the application for a renewal of the 1977 permit out of fear of stricter limits. Indeed, it appears that Texaco refused at least one DNREC request for data on the operation of the facilities. On the other hand, DNREC has not taken legal action with regard to this incident. Texaco surely should have complied with DNREC's request. Still, we cannot say that this incident alone amounts to a finding of bad faith throughout the relevant years.

Third, plaintiffs reiterate their broad claims that Texaco failed to meet its duty to investigate and report the causes of violations. As we have already noted, Texaco indeed failed to perform these tasks on many occasions. This was, in our view, mostly the product of poor judgment and chaotic organization of personnel and resources. It was not a deliberate strategy. There is, therefore, no evidence of bad faith in this regard.

Fourth, plaintiffs allege that Texaco acted in bad faith in this litigation. We disagree. While many of Texaco's "defenses" have been unsuccessful, Texaco's counsel would have been derelict had it not pressed them. Some of these defenses reappeared even after our earlier grant of summary judgment but as a means of mitigating liability. The same can be said of its advancement of the theory that the EPA expects a certain amount of non-compliance. We find that these actions were not taken in bad faith.

The plaintiffs also claim that Texaco tried to convey to the Court that DNREC and the State of Delaware had no quarrel with Texaco's operation of the Refinery, even though it was aware that the Attorney General had written a blistering attack on the refinery's practices in July 1990. PEX 447. This letter, while certainly engaging reading material, did not alter our view of Texaco's interaction with DNREC. Texaco should have produced the letter, but failure to do so was not, in our view, an indication of bad faith in evading permit limits.

In sum, we find that Texaco has largely acted in good faith to comply with the permit limits. There are instances where Texaco and its employees acted incompletely, incompetently, or even irresponsibly, but nothing convinces us that the company acted with an evil motive. This finding thus argues against imposition of a maximum penalty.

### e. Economic Impact of Penalty on Violator

Texaco has not demonstrated that a large penalty would have an adverse impact on the company. Given the record before us, we find that a large penalty would not necessarily cause serious damage to the company's ability to continue in business and compete in the marketplace.

### f. Other Matters as Justice Requires

The parties have raised no other matters not already considered by the Court.

### 2. Conclusions of Law

■ In applying the statutory factors to the facts of this case, we are mindful of the fact that civil penalties seek to deter

pollution by discouraging future violations. *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. at 1166. To fulfill this goal,

> the amount of the civil penalty must be high enough to insure that polluters cannot simply absorb the penalty as a cost of doing business. Otherwise, a rational profit maximizing company will choose to pay the penalty rather than incur compliance costs.... Additionally, the probability that a penalty will be imposed must be high enough so that polluters will not choose to accept the risk that non-compliance [will] go unpunished.

*Id.* (citation omitted).

 We believe that many of the violations at issue were fairly serious. When the violations of the early years are aggregated, their seriousness is enhanced. On the other hand, Texaco has taken affirmative steps in good faith to remedy both the violations themselves and the mechanical problems that may cause them. These steps have had demonstrated results in that the violations have decreased substantially over the years. Texaco has not, however, shown much inclination to improve its internal investigation practices and has never evaluated the impact of its violations on the receiving waters. The latter omissions have benefitted Texaco economically.

In light of the factual findings made above, we will impose a fine on Texaco which, because of the marked improvement over the years in Texaco's compliance, will not increase in daily amount for post-February 4, 1987, violations. *See* 33 U.S.C. § 1319(d). The amount of the fine for each violation day will be $500, multiplied by the 3360 days of violation we have calculated in Part III A. This results in a total fine to be imposed of $1,680,000.

## V. INJUNCTIVE RELIEF

 Plaintiffs seek a permanent injunction (a) prohibiting further violations of the Refinery's NPDES permit and (b) requiring the refinery to (i) promptly and thoroughly investigate and report to DNREC the causes of any future violations and (ii) sponsor a monitoring program to determine the nature and impact of past and any future noncomplying discharges.

In determining whether to grant injunctive relief, the Court must consider (1) actual success on the merits, (2) irreparable harm to the plaintiffs as the moving party, (3) harm to other interested persons, including the non-movant, and (4) the public interest. *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. at 1168. The Court may issue an injunction under the Act "only after a showing both of irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest." *Texaco II* at 941. We believe that the plaintiffs have made the required showings.

### A. Success on the Merits

Plaintiffs have plainly succeeded on the merits of the vast majority of their claims of violations of the permits.

### B. Irreparable Harm and Inadequacy of Legal Remedies

The plaintiffs have demonstrated irreparable harm and inadequacy of legal remedies. " 'Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.' " *Id.* (quoting *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987)). Dr. Livingston testified to the long term and cumulative nature of the environmental threat stemming from continued excessive discharge of pollutants. Harm or threatened harm to the environmental interests of plaintiffs' members—and the River itself—is thus irreparable. Moreover, the nature and extent of the harm will not be known until the monitoring provisions of the permit are complied with.

### C. Harm to Others

An injunction will not harm Texaco.[9] In large measure the injunction will require

9. The Refinery is now operated by Star Enterprise, which is a joint venture of Texaco and the Saudi Arabian Oil Company. The injunction ordered today is binding on Star because it is in

Texaco (and Star) to comply with terms of its permit. *See Powell Duffryn*, 913 F.2d at 83 (affirming injunction against further violation). While the opportunity for judicial oversight of such compliance is an important element of the injunctive relief requested, such oversight will be unnecessary if Texaco obeys the law. *See PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. at 1167–68. An injunction barring future permit violations will promote vigilance consistent with the underlying purposes of the Act. Indeed, there is evidence that Texaco has responded positively to judicial oversight. Nevertheless, there is no assurance that the refinery will be operated in a way to avoid future permit violations. *See id.* at 1162, 1168 (injunction issued where plant was "adequate"). Thus, even though the number of violations has decreased significantly, we are not convinced that they will cease.

We also feel that the monitoring would not burden Texaco. We find that such a program, whether or not conducted using existing personnel and facilities, is required by the permit.

### D. *The Public Interest*

Finally, we believe that the public interest would be vindicated by compliance with the permit and implementation of a monitoring program. The Clean Water Act reveals Congress's desire to have citizens protect the Nation's waters by resorting to the courts. This litigation has had, and would likely continue to have, a salutary effect in this regard.

In light of the above, we find that, given the plaintiffs' success in this Court, the danger of irreparable harm and the inadequacy of legal remedies, and the public interest in protection of the nation's waters, these factors all weigh in favor of granting the plaintiffs' request for injunctive relief. This relief would place some burden on Texaco, but that burden would be relatively slight. We therefore find that the injunctive relief is appropriate.

active concert and participation with Texaco. Fed.R.Civ.P. 65(d). *See Texaco I*, 719 F.Supp. at 290–91. Star, which was formed in 1989, refines, markets and distributes Texaco-branded

## VI. CONCLUSION

For the reasons stated above, Texaco must pay into the United States Treasury the sum of $1,680,000. *See Powell Duffryn*, 913 F.2d at 82. Moreover, Texaco is hereby enjoined from further violations of the 1989 permit and is directed to comply with its investigatory, reporting, and monitoring provisions.

products. In the first year of its existence, the joint venture provided cash benefits and savings of approximately $1.8 billion to Texaco. *See* PEX 335, 1989 Annual Report at 29.